## No. 27251

## Robert S. Matthews v. State of Colorado, Department of Revenue

(562 P.2d 415)

Decided April 4, 1977.

Maynes & Anesi, Sarah Duncan, for plaintiff-appellee.

J. D. MacFarlane, Attorney General, Jean E. Dubofsky, Deputy, Edward G. Donovan, Solicitor General, Billy Shuman, Special Assistant, for defendant-appellant.

*En Banc.*

MR. JUSTICE KELLEY delivered the opinion of the Court.

The question before us is whether it is constitutionally permissible for the Colorado taxing authorities to deny a trade-in allowance in computing the use tax on a motor vehicle purchased out of state when such a credit is allowed when the vehicle is purchased in Colorado. The trial court held that such unequal treatment was discriminatory and constituted an impermissible burden on interstate commerce. *U.S. Const.* Art. I, § 8. We agree and affirm.

"(1) On November 14, 1973, Appellant Robert S. Matthews purchased a mobile home[1] in Arizona from an Arizona retail merchant. The asking price for this mobile home was $11,500.00 which was reduced by $7,015.00 for a trade-in mobile home owned by Defendant [apparently this should read ''Appellant''], which was licensed in Colorado. Mr. Matthews paid the Arizona mobile home dealer $4,485.00 plus the trade-in mobile home, which was to be resold in the usual course of the retailer's business.

---

[1] It was stipulated that the vehicle was a motor home to be licensed as a motor vehicle.

"(2) On November 28, 1973, Appellant licensed the newly purchased mobile home in La Plata County, Colorado. Agents of the Department of Revenue required him to pay tax on the total asking price of $11,500.00 in the amount of $345.00. This tax was paid under protest.

"(3) At that time and during subsequent Department of Revenue hearings, it was stated that trade-in value would be subtracted from total purchase price for use tax purposes, only if that trade-in were made in Colorado to a Colorado retailer."

Colorado imposes a sales tax upon the "purchase price" paid on all retail sales and purchases of tangible personalty in Colorado. Section 39-26-104(1)(a), C.R.S. 1973. In a retail sale involving the exchange of property (trade-in), the statute also allows a credit for the fair market value of property exchanged if that property is to be resold in the usual course of the retailer's business. Section 39-26-104(1)(b), C.R.S. 1973. However, the statutory definition of "purchase price" precludes credit for the value of the property traded, when the sale occurs outside the state of Colorado. Section 39-26-102(7) and (9), C.R.S. 1973. The statute further provides that in order for the exchanged property to qualify for the tax credit, the retailer must be licensed in and responsible for payment of sales taxes to the state of colorado. Sections 39-26-103 and 105, C.R.S. 1973.

Supplementary to the sales tax, Colorado has enacted a *use* tax upon the privilege of storing, using or consuming tangible personal property in Colorado which has been purchased outside of Colorado. Section 39-26-202, C.R.S. 1973. A credit against the *use* tax equal to the tax paid on the purchase to another state by reason of a similar tax is allowed by statute. Section 39-26-203, C.R.S. 1973. However, there is no provision for a credit for property traded or exchanged out of state as in the case of the sales tax. Regulations issued by the Department of Revenue implement the use tax and are consistent with the statutory scheme. The trial court found the regulations to be invalid.

In essence the taxpayer is objecting to paying a higher tax on an out-of-state purchase than he would have had to pay had he made the same deal in Colorado. Although the rate (three percent) is nominally the same in each instance, the in-state transaction has the benefit of having the tax levied on a lower tax base. The power of the state to levy the use tax is not questioned, rather the issue is whether the state can discriminate in favor of those who purchase from in-state retailers.

The central concern of this appeal involves the application of federal constitutional law under the Commerce Clause to the Colorado sales and use tax schemes. Although the state contends that the use tax is a separate tax and should be viewed in isolation, only the most abstract

legalistic approach can justify such an argument. Use taxes are enacted primarily to equalize the tax burden as between those who purchase within and without the state. *Halliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64 at 66, 83 S.Ct. 1201 at 1202, 10 L.Ed.2d 202 at 204 (1963); *Miller Brothers Co. v. Maryland*, 347 U.S. 340 at 343, 74 S.Ct. 535 at 538, 98 L.Ed. 744 at 747 (1954); Comment, *The Trade-in Deduction: Discrimination under the Sales and Use Taxes*, 37 *N.Y.U.L. Rev.* 306 (1962). The Department of Revenue virtually conceded as much in its answer brief filed in the district court. We are aware of no court where such an artificial division of the tax scheme has been accepted in determining the effects of the use tax on commerce.

■ The state also argues that the Interstate Commerce Clause is not applicable, or, in the alternative, that any burden created on interstate commerce is too slight to merit application of the Commerce Clause. The state would have the court conclude that the Commerce Clause does not apply, without first considering the effect of the taxing scheme on interstate commerce. The court cannot properly reach such a conclusion.

■ The fact of the matter is that Colorado has created a tax system which discourages Coloradoans from making significant trade-in purchases (such as motor vehicles) out of state. While Colorado can have a use tax to prevent sales tax avoidance and thus equalize the tax burden among Colorado purchasers of retail products, the state cannot structure the tax system to discriminate against out-of-state purchases. *Henneford v. Silas Mason Co.*, 300 U.S. 577, 57 S.Ct. 524, 81 L.Ed. 814 (1937).

■ The Department of Revenue approaches the problem from the perspective of whether the Congress has preempted the field and deprived the state of the power to levy such taxes. This approach misapprehends the issue. The Commerce Clause, although worded in terms of what Congress shall have the power to regulate, has long since been interpreted to proscribe the burdening of interstate commerce by the states.

"In short, the Commerce Clause even without implementing legislation by Congress is a limitation upon the power of the States. In so deciding we reaffirmed, upon fullest consideration, the course of adjudication unbroken through the Nation's history. This limitation on State Power . . . does not merely forbid a State to single out commerce for hostile action. A State is also precluded from taking any action which may fairly be deemed to have the effect of impeding the free flow of trade between States."

*Freeman v. Hewit*, 329 U.S. 249 at 252, 67 S.Ct. 274 at 276, 91 L.Ed. 265 at 271, *reh. denied*, 329 U.S. 832, 67 S.Ct. 497, 91 L.Ed. 705 (1946) (citations omitted).

■ The only justification the state offers for discriminating against interstate commerce is administrative convenience. The state argues that when criminally inclined Coloradoans make trade-in purchases out of

state, it will be difficult to police any overvaluation of the trade-in. In the first instance, criminals who fraudulently report the amount of cash paid could just as easily fraudulently report the total purchase price paid. More fundamentally, the Department of Revenue's convenience in apprehending what must be a small number of potential tax lawbreakers seems poor justification for discriminating against the potential interstate commerce generated by trade-in Colorado purchasers. The United States Supreme Court reached a similar conclusion when it upheld South Carolina's right to tax shrimp taken in its off-shore waters, but found that it was an unconstitutional burden on commerce to require all shrimp boats to dock at a South Carolina port for the tax to be imposed before shipment to another state:

"But the importance of having commerce between the forty-eight states flow unimpeded by local barriers persuades us that State restrictions inimical to the commerce clause should not be approved simply because they facilitate in some measure enforcement of a valid tax."

*Toomer v. Witsell*, 334 U.S. 385 at 406, 68 S.Ct. 1156 at 1167, 92 L.Ed. 1460 at 1476 (1947).

■ The United States Supreme Court has not decided a case exactly like this one, but it has established principles in the state sales and use tax context which should be determinative here. Most relevant is *Henneford v. Silas Mason Co., supra,* and its progeny, such as *Halliburton Oil Well Cementing Co. v. Reily, supra.*

*Henneford* upheld the concept of the use tax when used by the State of Washington as a complement to its sales tax. The court held that the state had the power to tax the use of property within the state if the tax was nondiscriminatory against interstate commerce:

"When the account is made up, the stranger from afar is subject to no greater burdens as a consequence of ownership than the dweller within the gates. The one pays upon one activity or incident, and the other upon another, but the sum is the same when the reckoning is closed. Equality exists when the chattel subjected to the use tax is bought in another state and then carried into Washington."

300 U.S. at 584, 57 S.Ct. at 527, 81 L.Ed. at 819.

The enunciated principle of equality of treatment to intrastate and interstate commerce by the overall taxation scheme was applied in *Halliburton* to invalidate Louisiana's use tax because discrepancies in the tax burden arose from different methods of applying the sales and use taxes. The appellant in *Halliburton* manufactured its own specialized equipment in Oklahoma and then shipped it to Louisiana for its own use. The two percent Louisiana use tax was levied against a base consisting of the value of materials used in the manufacturing process, plus the value of labor and shop overhead attributable to the units. Had the appellant manufactured the units in Louisiana, the tax base would have excluded

the value of labor and shop overhead. The Court held this scheme unconstitutional because of the inequality of treatment that encouraged intrastate commerce, potentially at the expense of interstate commerce. The Colorado scheme has a like effect in that Coloradoans are forced to pay higher taxes when they trade out of state than when they trade in Colorado. The methods used by Colorado and Louisiana to achieve this end are fundamentally the same: an unequal adjustment of the tax base to which an equal tax rate is applied.

The Louisiana tax scheme was struck down in *Halliburton* for another reason, even more analogous to Colorado's unequal treatment. The appellant had purchased articles second hand in other states for eventual use in Louisiana. Louisiana levied the use tax against the articles. However, had the appellant purchased the secondhand articles in Louisiana, no tax would have been levied because of an exemption for such items in the sales tax. In holding that the system of tax exemptions discriminated against interstate commerce, the Court observed that the "effect of the tax is to favor local users who wish to dispose of equipment over out-of-state users similarly situated." In like fashion, the Colorado scheme of exemptions favors local retailers who accept trade-ins over out-of-state retailers.

In both Connecticut and West Virginia, the state legislatures provided a trade-in exemption in sales tax schemes identical to Colorado's. Like Colorado, both states failed to provide a trade-in exemption in the use tax. The Connecticut and West Virginia courts held that the schemes constituted violations of the Commerce Clause. *See Emmet & Son Oil Supply Co. v. Sullivan*, 158 Conn. 234, 259 A.2d 636 (1969); *Nuckols v. Athey*, 149 W.Va. 40, 138 S.E.2d 344 (1964). We agree with the Connecticut and West Virginia courts.

The judgment is affirmed.