**ARCHER DANIELS MIDLAND COMPANY, a Delaware corporation, Plaintiff-Appellant,**

v.

**STATE of Colorado; Colorado Department of Revenue; Richard D. Lamm, in his official capacity as Governor of Colorado; and Alan N. Charnes, in his official capacity as Executive Director of the Colorado Department of Revenue, Defendants-Appellees.**

**No. 83SA23.**

Supreme Court of Colorado,
En Banc.

Aug. 20, 1984.
Rehearing Denied Sept. 10, 1984.

Davis, Graham & Stubbs, Alan M. Loeb, Margaret Leavitt, Denver, for plaintiff-appellant.

Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Denver, for defendants-appellees.

DUBOFSKY, Justice.

Archer Daniels Midland Company, the plaintiff, appeals a Denver District Court ruling upholding the constitutionality of section 39–27–102(1)(a)(III), 16B C.R.S. (1982), which provides for a five cent per gallon sales tax reduction on certain gasohol containing at least ten percent alcohol derived from agricultural and forest prod-

ucts.[1] The tax reduction is limited to gasohol "produced from no more than three million gallons of alcohol annually from each facility having a design production capacity of seventeen million gallons or less per year of such alcohol." Section 39–27–102(1)(a)(III), 16B C.R.S. (1982). We affirm the ruling of the district court and hold that the statute does not violate the Commerce Clause, art. I, § 8, cl. 3, or the Equal Protection Clause, amend. XIV, § 1, of the United States Constitution.

The parties stipulated to the facts relevant to the disposition of this case. In 1978, the General Assembly adopted a five cent reduction in gasoline tax for gasohol containing at least ten percent alcohol "manufactured in Colorado" and derived from agricultural and forest products.[2] Ch. 118, sec. 1, § 39–27–102, 1978 Colo. Sess.Laws 516, 516–17. At that time there were no Colorado producers of fuel-grade alcohol. In 1979, the plaintiff began selling fuel-grade alcohol to Colorado gasohol producers.[3] In March 1981, the plaintiff filed its initial complaint in this action, seeking a declaration that the version of section 39–27–102 then in effect was unconstitutional. In July 1981, the first Colorado-produced fuel-grade alcohol became available for blending with gasoline. Gasohol blended with Colorado alcohol was eligible for the nickel tax break under section 39–27–102 while gasoline blended with alcohol produced by the plaintiff was not. Because gasohol is nine parts gasoline for every one part of alcohol, one gallon of qualifying alcohol mixed with nine gallons of gasoline results in a fifty-cent tax savings. Thus, all other things being equal,

nonqualifying fuel-grade alcohol must be priced fifty cents less per gallon than qualifying alcohol to be price-competitive. Since Colorado-produced alcohol became available, the plaintiff—which sold 29,000 gallons of fuel-grade alcohol to Colorado gasohol producers in 1979, 337,918 gallons in 1980, and 210,958 gallons in the first half of 1981—has made only two Colorado sales, totalling 40,701 gallons.

In February 1982, the Minnesota Supreme Court held that a statute similar to the 1978 version of section 39–27–102 violated the Commerce Clause of the United States Constitution because a state may not constitutionally discriminate against out-of-state producers of fuel-grade alcohol. *Archer Daniels Midland Co. v. State,* 315 N.W.2d 597 (Minn.1982). In April 1982, the General Assembly amended section 39–27–102, striking the requirement that fuel eligible for the nickel tax break be made from Colorado-produced alcohol and substituting a provision that the first 3,000,000 gallons of gasohol made from alcohol produced in facilities with a 17,000,-000 gallon per year capacity or less are eligible for the tax break. Ch. 155, sec. 1, § 39–27–102, 1982 Colo.Sess.Laws 573, 573–74, codified at section 39–27–102(1)(a)(III), 16B C.R.S. (1982).[4] All of the facilities owned by the plaintiff have a capacity greater than 17,000,000 gallons per year, therefore none of the alcohol which the plaintiff produces may be used to make gasohol eligible for the tax break.

In April 1982, the plaintiff filed a supplemental complaint alleging that section 39–27–102(1)(a)(III), 16B C.R.S. (1982) violates the Commerce and Equal Protection Claus-

1. Because the decision below involved a determination of the constitutionality of a statute, this court has jurisdiction to resolve the appeal. § 13–4–102(1)(b), 6 C.R.S. (1973).

2. Gasohol is a blend of nine parts gasoline and one part fuel-grade alcohol. "Fuel-grade alcohol" includes ethanol of 199.5 proof or better.

3. The parties stipulated that the plaintiff produces approximately 70% of the fuel-grade alcohol consumed in the United States.

4. Section 39–27–102(1)(a)(III) reads:

"Notwithstanding other provisions of this part 1, gasoline which is blended with at least ten percent by volume of alcohol derived from agricultural commodities and forest products shall be taxed five cents per gallon less than gasoline which does not contain such a blend. Such tax reduction shall be limited to such blended gasoline which is produced from no more than three million gallons of alcohol annually from each facility having a design production capacity of seventeen million gallons or less per year of such alcohol. This tax reduction shall remain in effect until July 1, 1985...."

es of the United States Constitution. Several months earlier, on January 26, 1982, the district court denied the state defendants' motion to dismiss which asserted that the plaintiff did not have standing to challenge the gasohol tax reduction statute. On November 17, 1982, the district court upheld the constitutionality of section 39–27–102(1)(a)(III), 16B C.R.S. (1982).

## I.

■ Before reaching the constitutional issues in this case, we must determine whether the plaintiff has standing to challenge section 39–27–102(1)(a)(III) under the Commerce and Equal Protection Clauses of the United States Constitution. The state argues that the plaintiff does not have standing to pursue this action, citing *Wimberly v. Ettenberg*, 194 Colo. 163, 570 P.2d 535 (1977). To demonstrate standing under *Wimberly*, a litigant must prove that it has suffered "injury in fact to a legally protected interest as contemplated by statutory or constitutional provisions." 570 P.2d at 539. *See generally Cloverleaf Kennel Club, Inc. v. Colorado Racing Commission*, 620 P.2d 1051 (Colo.1980).

■ The state asserts that the plaintiff failed to present evidence at trial sufficient to prove the requisite injury in fact. Conceding that the gasohol tax reduction statute places the plaintiff's alcohol at a fifty-cent-per-gallon competitive disadvantage, the state contends that the plaintiff has failed to prove that it would be able to sell its alcohol in Colorado but for this fifty-cent differential. The state suggests that the plaintiff's failure to sell fuel-grade alcohol in Colorado is due to high freight charges and generally high prices charged by the plaintiff. However, given the unpredictability of competitive markets in general, and the gasohol market in particular, there is no requirement that the plaintiff prove exactly how much alcohol it could sell but for the challenged statute. *See Cloverleaf Kennel Club, Inc. v. Colorado Racing Commission*, 620 P.2d at 1058 (The injury in fact conferring standing may be intangible and exist solely by virtue

of statutes creating legal rights.); *Boston Stock Exchange v. State Tax Commission*, 429 U.S. 318, 334 n. 13, 97 S.Ct. 599, 609 A. 13, 50 L.Ed.2d 514 (1977) (Even if a discriminatory state tax "is not now the sole cause of New York residents' refusal to trade on out-of-state exchanges, at the very least it reinforces their choice of an in-state exchange and is an inhibiting force to selling out of State; that inhibition is an unconstitutional barrier to the free flow of commerce."). Since the statute puts the plaintiff at a competitive disadvantage, the plaintiff has suffered an injury to its economic interest; the question is whether that injury is to a legally protected interest within the meaning of *Wimberly*.

■ In *Boston Stock Exchange v. State Tax Commission*, 429 U.S. at 320 n.3, 97 S.Ct. at 602 n.3, the United States Supreme Court held that the right of a business to engage in interstate commerce free of discriminatory taxes is "within the zone of interests" protected by the Commerce Clause. *See also Bacchus Imports v. Dias*, —— U.S. ——, 104 S.Ct. 3049, 81 L.Ed.2d —— (1984). However, we have distinguished the *Wimberly* legally-protected-interest test from the federal arguably-within-the-zone-of interest standing test. *Cloverleaf Kennel Club, Inc. v. Colorado Racing Commission*, 620 P.2d 1051 (Colo. 1980). The question before us is not whether the plaintiff's interest is arguably within a zone of protection, but whether that interest is entitled, as a matter of law, to legal protection. *Id.* It could be argued that the legally-protected-interest test requires that this court determine whether the framers of the Commerce Clause intended to protect individual interstate businesses or to grant such businesses a "roving commission" to protect interstate commerce. *See id.* at 1058–1059. However, given repeated United States Supreme Court vindication of the rights of businesses to obtain relief under the Commerce Clause, *e.g., Bacchus Imports v. Dias*, 104 S.Ct. 3049 (1984); *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383

(1977); *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970); *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951); *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935), we decline to engage in an independent evaluation of the framers' intent.[5] Whatever the intent of the framers, the Commerce Clause now creates a legally protected interest on the part of individual businesses to be free of state taxes and regulations which discriminate against interstate commerce.

■■■ The question of the plaintiff's standing under the Equal Protection Clause is more straightforward. Individual corporations qualify as "persons" granted a legal interest in equal protection of state laws by the Fourteenth Amendment. *Santa Clara County v. Southern Pacific Railroad*, 118 U.S. 394, 6 S.Ct. 1132, 30 L.Ed. 118 (1886); *Hudson Valley Freedom Theater, Inc. v. Heimbach*, 671 F.2d 702 (2d Cir.) *cert. denied*, 459 U.S. 857, 103 S.Ct. 127, 74 L.Ed.2d 110 (1982). The state urges the significance of the fact that the plaintiff is not taxed directly by the challenged statute, since the distributor first receiving gasoline in Colorado is primarily liable for the tax. Section 39–27–102(1)(a)(I), 16B C.R.S. (1982). However, for purposes of standing, this court will not distinguish between direct and indirect violence to constitutionally protected rights. *See Conrad v. City & County of Denver*, 656 P.2d 662 (Colo.1982) (upholding standing based, in part, on indirect economic injury). The Commerce and Equal Protection Clauses protect against ingenious as well as open discrimination. *See United States v. Guest*, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966) (the Equal Protection Clause); *Best & Co. v. Maxwell*, 311 U.S. 454, 61 S.Ct. 334, 85 L.Ed. 275 (1940) (the Commerce Clause). We agree with the district court's conclusion that the plaintiff

has standing to challenge the gasohol tax reduction statute. *Cloverleaf Kennel Club, Inc. v. Colorado Racing Commission*, 620 P.2d 1051 (1980); *Wimberly v. Ettenberg*, 194 Colo. 163, 570 P.2d 535 (1977).

## II.

■■■ Since at least 1851 the Commerce Clause—which grants the United States Congress power to regulate interstate commerce—has been recognized as a limitation on state power to regulate interstate commerce, even in the absence of conflicting federal legislation. *See Cooley v. Board of Wardens*, 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1851). The Commerce Clause embodies the principle "that one state in its dealings with another may not place itself in a position of economic isolation." *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. at 527, 55 S.Ct. at 502. Where a state law amounts to "simple economic protectionism," courts apply a "virtually *per se* rule of invalidity." *Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978). *See Matthews v. State Department of Revenue*, 193 Colo. 44, 562 P.2d 415 (1977) (invalidating a statute which effectively taxed out-of-state purchasers of motor vehicles more than in-state purchasers). Even a facially-neutral law will be held invalid as simple economic protectionism if it was enacted to effect a discriminatory purpose. *Bacchus Imports v. Dias*, — U.S. —, 104 S.Ct. 3049, 81 L.Ed.2d — (1984); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471 n. 15, 101 S.Ct. 715, 727 n. 15, 66 L.Ed.2d 659 (1981). Where, however, a facially-neutral statute, having effects on interstate commerce which are "only incidental," is responsive to a legitimate local governmental purpose, it will be upheld "unless the burden imposed on such commerce is clearly excessive in relation to the putative local bene-

---

**5.** During the period when the cited cases were decided, the United States Supreme Court announced various formulations of the federal law of standing. *See generally* Davis, *The Liberalized Law of Standing*, 37 U.Chi.L.Rev. 450 (1970). Our research has located no case in which the court applied explicitly a legally-protected-interest analysis to a Commerce Clause challenge.

fits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). Our first task, therefore, is to determine whether section 39–27–102(1)(a)(III), 16B C.R.S. (1982) "is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns." *Philadelphia v. New Jersey*, 437 U.S. at 624, 98 S.Ct. at 2536.

## A.

The parties agree that section 39–27–102(1)(a)(III), 16B C.R.S. (1982) is intended to encourage the development of a Colorado fuel-grade alcohol industry, increasing the market for Colorado agricultural and forest products, and to encourage the use of gasohol generally, decreasing air pollution and dependence on foreign oil. *See* section 35–39–101, 14 C.R.S. (1983 Supp.). In dispute is whether the General Assembly intended to accomplish these purposes by protecting Colorado fuel-grade alcohol producers from interstate competition, as the plaintiff alleges, or whether, as the state maintains, the legislative intent was to provide an incentive to entrepreneurs to enter the Colorado fuel-grade alcohol market and, thus, to increase competition. At issue is the purpose of the production capacity limitation of section 39–27–102(1)(a)(III), which restricts application of the tax break to gasohol made from 3,000,000 gallons of alcohol annually from facilities with a production capacity of 17,000,000 gallons per year or less.

No Colorado fuel-alcohol producers are large enough to be affected by the production capacity limitation, but alcohol from several out-of-state facilities, including those of the plaintiff, does not qualify for the tax break under the 17,000,000 gallons per year capacity limit. The plaintiff asserts that the production capacity limitation was enacted to discriminate against out-of-state firms. The state argues to the contrary, that the General Assembly intended the production capacity limitation to effect a legitimate local governmental purpose: to limit the revenue loss to the Highway Users Tax Fund, which, under section 43–4–203(1)(a), 17 C.R.S. (1973), is the sole beneficiary of gasoline excise taxes. *See* Colo. Const. art. X, § 18 (proceeds from excise taxes on liquid motor fuel, other than aviation fuel, to be used only for highway purposes).

The parties stipulated at trial to the accuracy of transcripts of hearings on the 1982 amendments to section 39–27–102 before the Colorado House Committee on Transportation and Energy and the Colorado Senate Committee on Transportation. Conceding that the statute is facially-neutral, the plaintiff argues that the committee transcripts demonstrate that section 39–27–102(1)(a)(III) was enacted to effect a discriminatory purpose and that the statute, therefore, is invalid as simple economic protectionism. The district court acknowledged that the plaintiff's allegation of discriminatory purpose finds some support in the transcripts. We agree that statements made by various committee members, including the representative who introduced the 1982 amendment to section 39–27–102 (replacing the "manufactured in Colorado" limitation on eligibility for the tax break with the 17,000,000 gallons per year capacity limitation), suggest discriminatory intent. The state, however, contends that the intent of the General Assembly may not be inferred from the statements of individual committee members, citing *United States Brewers Association v. Healy*, 532 F.Supp. 1312 (D.Conn.), *rev'd on other grounds*, 692 F.2d 275 (2d Cir.1982), *aff'd*, — U.S. —, 104 S.Ct. 265, 78 L.Ed.2d 248 (1983). In rebuttal the plaintiff cites *Americans United v. State*, 648 P.2d 1072, 1075 n.1 (Colo.1982) in which this court, upholding the constitutionality of a statute, considered statements of a legislator.

 We reject the proposition that contemporaneous statements of individual legislators are irrelevant to judicial inquiry into legislative intent. *See Americans United v. State*, 648 P.2d at 1075 n.1. Acts of the General Assembly, however, are presumed constitutional until proven otherwise beyond a reasonable doubt. *Loup-*

*Miller Construction Co. v. Denver*, 676 P.2d 1170 (Colo.1984); *Dawson v. Public Employees' Retirement Association*, 664 P.2d 702 (Colo.1983). While the statements of individual legislators may be helpful in determining the proper construction of statutory language, such statements, in and of themselves, will seldom be sufficient to prove an impermissible legislative motivation beyond a reasonable doubt. *See Michael M. v. Superior Court*, 450 U.S. 464, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981) (plurality opinion) (individual legislators may have voted for the statute for a variety of reasons).[6] The plaintiff asserts that in *Hunt v. Washington Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), the United States Supreme Court made a finding of discriminatory purpose based on the North Carolina Agriculture Commissioner's statement that North Carolina apple producers were mainly responsible for the legislation at issue. The United States Supreme Court has cited *Hunt* for the proposition that a finding of simple economic protectionism may be made on the basis of discriminatory purpose. *Bacchus Imports v. Dias*, —— U.S. ——, 104 S.Ct. 3049, 81 L.Ed.2d —— (1984). In *Hunt*, however, after noting the Commissioner's statement, the court stated: "we need not ascribe an economic motive to the North Carolina Legislature to resolve this case . . . ." *Id.* 432 U.S. at 352, 97 S.Ct. at 2446. The court made no finding that the statute in *Hunt* was simple economic protectionism.

The fact that the nickel tax break was originally limited to gasohol made from Colorado-produced alcohol does not persuade us that the statute as amended in 1982 was intended to discriminate against out-of-state producers. The General As-sembly's decision to eliminate the manufactured-in-Colorado limitation extended the tax break to gasohol produced from out-of-state alcohol, giving rise to the possibility of a significant loss of revenue to the Highway Users Tax Fund unless application of the tax break was limited in some other manner. By instituting a production capacity limitation, the General Assembly could have intended to provide an incentive to entrepreneurs to enter the fuel-grade alcohol market without subsidizing larger, more established producers. *In re Senate Bill No. 95*, 146 Colo. 233, 361 P.2d 350 (1961), cited by the plaintiff, does not compel a different conclusion. In that case, based on the history of the legislation at issue, this court found a bill *"unquestionably conceived, cut, tailored and amended"* to accomplish an unconstitutional purpose. *Id.* 361 P.2d at 354 (emphasis added). The facts of the instant case do not justify a similar finding.

The plaintiff has not met its burden of proving that the General Assembly passed the instant statute to effectuate a discriminatory purpose. Since section 39–27–102(1)(a)(III) is rationally related to the legitimate local governmental purpose of providing an incentive for fuel-grade alcohol production while limiting the revenue loss to the Highway Users Tax Fund, we hold that the statute is not simple economic protectionism, and therefore is not *per se* invalid under *Philadelphia v. New Jersey*, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). It remains to be determined, however, whether the statute's incidental effects on interstate commerce are "clearly excessive" given the nature of the governmental purpose involved.

---

**6.** In *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), the United States Supreme Court ruled, in the context of strict scrutiny of legislative action under the Fourteenth Amendment, that once a plaintiff sets forth a prima facie case of discriminatory intent, the burden of proof shifts to the state to rebut the presumption of unconstitutional action. The court, in *Village of Arlington Heights v. Metropolitan Housing Dev.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), made clear that contemporaneous statements by legislators could be used to make this prima facie case. Our inquiry into the validity of economic regulation under the Commerce Clause is not, however, analogous to strict scrutiny of legislation under the Fourteenth Amendment. In the context of the instant case the burden remains on the plaintiff at all times to prove discriminatory intent beyond a reasonable doubt.

## B.

We next consider whether the limitations imposed on interstate commerce by section 39–27–102(1)(a)(III) are clearly excessive within the meaning of *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). Under *Pike*, the extent of the burden on interstate commerce that will be tolerated depends "on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id.* at 142, 90 S.Ct. at 847.[7]

The plaintiff relies most heavily on *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). The North Carolina statute at issue in *Hunt* required that apples offered for sale or shipped into the state in closed containers bear no grade on the container other than the United States Department of Agriculture (USDA) grade. The Washington State Apple Advertising Commission challenged the statute, alleging that because Washington state grades are superior to USDA grades in all corresponding categories, the statute unconstitutionally burdened Washington apple growers. The court found that the statute raised the cost of doing business in North Carolina for Washington apple growers and dealers and stripped away the commercial advantage which the Washington industry had earned for itself through its expensive inspection and grading system. Identifying North Carolina's interest as the protection of its citizens from confusion and deception in the marketing of foodstuffs, the court found that the statute at issue actually magnified the problem "by depriving purchasers of all information

concerning the quality of the contents of closed apple containers." 432 U.S. at 353, 97 S.Ct. at 2446. "Since the statute does nothing at all to purify the flow of information at the retail level, it does little to protect consumers against the problems it was designed to eliminate." *Id.* The court overturned the statute on the basis that North Carolina had failed to justify the statute's burdening of interstate commerce in terms of "the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake." *Id.*

The instant case is distinguishable from *Hunt*. There the United States Supreme Court determined that the statute burdened an entire state industry because it raised the costs of doing business in North Carolina for all Washington apple growers and dealers. The effect of section 39–27–102(1)(a)(III), however, depends not on where an alcohol producer is located but on the production capacity of that producer. *Best & Co. v. Maxwell*, 311 U.S. 454, 61 S.Ct. 334, 85 L.Ed. 275 (1940), and *Boston Stock Exchange v. State Tax Commission*, 429 U.S. 318, 97 S.Ct. 599, 50 L.Ed.2d 514 (1977), cited by the plaintiff, are similarly distinguishable. In *Best & Co.* the United States Supreme Court overturned a statute which effectively discriminated against all out-of-state retail merchants by taxing every person not a regular retail merchant in North Carolina who displayed samples in hotel rooms in North Carolina for the purpose of securing retail orders. In *Boston Stock Exchange*, the court overturned a statute which taxed all out-of-state sales of securities at a higher rate than most in-

---

7. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), involved a facially-neutral Arizona statute which required all cantaloupes grown in Arizona to be packed in approved containers before sale. Acting under the statute, a state official prohibited Bruce Church, Inc. from transporting cantaloupes grown in Arizona to the company's nearby California plant for packing—requiring Bruce Church to either build a packing plant within Arizona or withdraw from the market. The court identified Arizona's interest as having cantaloupes identified as originating in Arizona and

held that that interest could not justify the requirement that the company build and operate an unneeded $200,000 packing plant in the state. The court declared that it "viewed with particular suspicion state statutes requiring business operations to be performed in the home State that could more efficiently be performed elsewhere. Even where the State is pursuing a clearly legitimate local interest, this particular burden on commerce has been declared to be virtually *per se* illegal." *Id.* at 145, 90 S.Ct. at 849.

state sales. *Hunt, Best & Co.* and *Boston Stock Exchange* all involved statutes which either facially, or in practical effect, discriminated against interstate business according to location. *See also Bacchus Imports v. Dias,* —— U.S. ——, 104 S.Ct. 3049, 81 L.Ed.2d —— (1984) (overturning as simple economic protectionism a tax exemption statute which applied only to locally-produced beverages).

The circumstances of the instant case are most squarely addressed by the United States Supreme Court's opinion in *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978). At issue in *Exxon Corp.* was a Maryland statute which prohibited any producer or refiner of petroleum products from operating a retail service station within the state of Maryland. This divestiture statute affected only interstate companies, since there were no Maryland producers or refiners of gasoline, but did not affect all out-of-state retailers. The court held that the "fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce." *Id.* at 126, 98 S.Ct. at 2214. The court stated:

> Some refiners may choose to withdraw entirely from the Maryland market, but there is no reason to assume that their share of the entire supply will not be promptly replaced by other interstate refiners. The source of the consumers' supply may switch from company-operated stations to independent dealers, but interstate commerce is not subject to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another.
>
> ... We cannot ... accept appellants' underlying notion that the Commerce Clause protects the particular structure or methods of operation in a retail market.... [T]he Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations.

*Id.* at 127–128, 98 S.Ct. at 2214–2215 (citations omitted).

In *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981), the United States Supreme Court upheld a statute banning the retail sale of milk in plastic nonreturnable cartons in the state of Minnesota. Although the statute would cause a shift in interstate commerce from manufacturers of plastic nonreturnable containers to producers of other containers, the court found "no reason to suspect that the gainers will be Minnesota firms, or the losers out-of-state firms." 449 U.S. at 473, 101 S.Ct. at 728.

Section 39–27–102(1)(a)(III) is less burdensome than the statutes at issue in *Exxon Corp.* and *Clover Leaf Creamery.* In *Exxon Corp.,* all producers or refiners of gasoline were prohibited from retailing gasoline in Maryland. In *Clover Leaf Creamery,* retail sale of all plastic nonreturnable milk cartons was banned from the state of Minnesota. In contrast, section 39–27–102(1)(a)(III) merely gives smaller alcohol producers a competitive advantage over larger plants. As was the case in *Exxon Corp.* and *Clover Leaf Creamery,* section 39–27–102(1)(a)(III) may be expected to result in a shift in the market from one kind of interstate supplier to another. The plaintiff has failed to prove, however, that the effect of the statute will be to "cause local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales on the market." *Exxon Corp.,* 437 U.S. at 126 n. 16, 98 S.Ct. at 2214 n. 16. Although the record reflects the recent emergence of a local Colorado fuel-alcohol industry, the plaintiff has not proven that any market gains made by that industry are due to a discriminatory effect of section 39–27–102(1)(a)(III). Aside from any effect of the challenged statute, Colorado fuel-grade alcohol producers have the advantage of close proximity to Colorado gasohol producers, resulting in lower freight costs. It is undisputed that Colorado gasohol producers obtain fuel-grade alcohol from both out-of-state and in-state alcohol producers and that there are numerous out-

of-state producers which qualify for the tax break.

The plaintiff argues that under *Hunt v. Washington Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) the state is required to employ the least burdensome alternative when instituting regulations which affect interstate commerce. We disagree. Under the test of *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), applied by the *Hunt* court, the question is whether a burden on interstate commerce is clearly excessive in relation to local benefits. Although recognizing that the availability of less burdensome alternatives is relevant to the determination of whether a burden on interstate commerce is "clearly excessive," *Pike* did not impose a requirement that all state regulation affecting interstate firms take the form of the least burdensome alternative. Such a requirement would expose all state economic regulation to strict judicial scrutiny, since virtually every regulation will have some effect on interstate commerce. *See Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). Only after a plaintiff has demonstrated that a statute has the effect of discriminating against interstate commerce, or burdening it significantly, must the state demonstrate the unavailability of less burdensome alternatives. *See Hunt*, 432 U.S. at 353, 97 S.Ct. at 2446; *Exxon Corp. v. Governor of Maryland*, 437 U.S. at 136, 98 S.Ct. at 2218 (Blackmun, J., dissenting). The plaintiff in the instant case has failed to prove facts sufficient to shift the burden of justifying the particular scheme of the challenged statute to the state.

The United States Supreme Court, in *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978), did not consider whether less burdensome alternative regulations might be available nor did the court weigh the importance of the state interests at issue. The court upheld the Maryland divestiture statute under the Commerce Clause solely on a finding that the plaintiffs had failed to prove an impermissible discrimination against, or burdening of, interstate commerce.[8] The court noted several possible effects on interstate commerce from the statute in *Exxon Corp.*, and stated: "It may be true that the consuming public will be injured by the loss of the high-volume, low-priced stations operated by the [out-of-state] independent refiners, but ... that argument relates to the wisdom of the statute, not to its burden on commerce." *Exxon Corp.*, 437 U.S. at 128, 98 S.Ct. at 2215. *See also Arkansas Electric Cooperative Corp. v. Arkansas Public Commission*, 461 U.S. 375, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983) (declining to second-guess the state's judgment that some degree of state regulation of wholesale electricity rates was necessary). *But see Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981) in which, despite a finding that the burden on interstate commerce was "relatively minor," the court reached the question of whether Minnesota's interest in banning the sale of plastic nonreturnable milk containers was substantial, and whether there were less burdensome alternatives as likely to be effective.[9] *Clover Leaf Creamery* is distinguishable, however, since the statute in that case banned an entire category of product from the Minnesota market. In contrast, the divestiture statute in *Exxon Corp.* did not ban a particular product but prohibited a limited number of interstate businesses from retailing gasoline. Even less restrictive, the statute challenged in the instant

**8.** The court already had found that the statute bore a reasonable relation to a legitimate state purpose in the context of a due process challenge.

**9.** The court upheld the statute, finding the state interest substantial and no less burdensome alternatives likely to be as effective. Elsewhere in its opinion, however, the court stated: "[t]he Minnesota Supreme Court may be correct that the Act is not a sensible means of conserving energy. But ... 'it is up to the legislatures, not courts, to decide on the wisdom and utility of legislation.'" *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 469, 101 S.Ct. 715, 726, 66 L.Ed.2d 659 (1981) (citation omitted).

case merely gives an incentive to produce fuel-grade alcohol to some firms but not others, depending on production capacity.

Because section 39–27–102(1)(a)(III) is less restrictive than the statute in *Exxon Corp.*, we will not second-guess the decision of the General Assembly to employ the particular statutory scheme here. Since section 39–27–102(1)(a)(III) is rationally related to the legitimate governmental purpose of providing a limited incentive for the production of fuel-grade alcohol and does not impermissibly burden interstate commerce, we hold that the statute does not violate the Commerce Clause.

### III.

The plaintiff alleges that section 39–27–102(1)(a)(III) violates the Equal Protection Clause of the United States Constitution by irrationally distinguishing between producers of fuel-grade alcohol by production capacity. The Equal Protection Clause does not require that "all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made." *Baxstrom v. Herold*, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966); *Loup-Miller Construction Co. v. Denver*, 676 P.2d 1170 (Colo.1984); *People v. Chavez*, 629 P.2d 1040 (Colo.1981). Except for cases involving fundamental rights or suspect classifications not at issue here, equal protection requires only that the distinctions made be rationally related to legitimate governmental purposes. *Loup-Miller Construction Co. v. Denver*, 676 P.2d at 1173–1174; *People v. Velasquez*, 666 P.2d 567 (Colo.1983), *appeal dismissed,* — U.S. ——, 104 S.Ct. 989, 79 L.Ed.2d 223 (1984).

We already have determined that the 17,000,000 gallons per year production capacity limitation of section 39–27–102(1)(a)(III) is rationally related to the legitimate purpose of reducing the revenue loss to the Highway Users Tax Fund and that the nickel tax break provided by the challenged statute is rationally related to the governmental purpose of providing an incentive for production of fuel-grade alcohol and gasohol. *See* Part II, *supra.* The General Assembly reasonably could have concluded that fuel-grade alcohol producers with an annual capacity of over 17,000,000 gallons per year are in no need of the tax incentive granted smaller fuel-grade alcohol producers by the challenged statute. We hold that section 39–27–102(1)(a)(III) does not violate the Equal Protection Clause.

Judgment affirmed.

LOHR, J., dissents, and ERICKSON, C.J., and NEIGHBORS, J., join in the dissent.

LOHR, Justice, dissenting:

The majority opinion holds that the plaintiff, Archer Daniels Midland Company (Archer Daniels), has not met its burden of proving that the General Assembly's capacity restrictions on producers whose fuel-grade alcohol is eligible for the nickel tax break were intended to effectuate discrimination against out-of-state producers. It determines that the limitations the statute imposes on interstate commerce are not clearly excessive, because it merely gives smaller alcohol producers a competitive advantage over larger plants. Since it holds that the plaintiff has not demonstrated that the statute has the effect of discriminating against interstate commerce, it does not consider the availability of less burdensome alternatives. Because I disagree with each of these conclusions, I respectfully dissent.

### I.

In 1978, the General Assembly adopted the nickel tax break for gasohol containing alcohol "manufactured in Colorado." Ch. 118, sec. 1, section 39–27–102, 1978 Colo. Sess.Laws 516, 517. There were no Colorado producers of fuel-grade alcohol at that time. No legislative declaration was included in that statute. A bill on a closely-related subject enacted four months later, however, did contain such a declaration. In ch. 100, sec. 1, section 35–39–101, 1978 Colo.Sess.Laws 461, where the General As-

sembly established a gasohol promotion committee, the following purposes were articulated:

> The general assembly hereby declares that the production and use of alcohol-gasoline motor fuel and alcohol-related industrial hydrocarbons derived from Colorado agricultural products and forest products will benefit the people of the state through reduced air pollution, decreased dependence on foreign oil production, and increased markets for *Colorado* agricultural products and forest products. In enacting this article, the general assembly intends to promote the production and use of alcohol and related industrial hydrocarbons derived from *Colorado* agricultural products and forest products, foster the development and utilization of such alcohol and related industrial hydrocarbons, and promote the use of such alcohol and hydrocarbons by the general public.

(Emphasis added.)

Archer Daniels filed its original complaint challenging the 1978 version of the nickel tax break on March 19, 1981. On February 12, 1982, the Supreme Court of Minnesota struck down a law limiting a four cent gasohol tax break to gasohol produced with "alcohol distilled in this state from agricultural products produced in this state ...." *Archer Daniels Midland Co. v. State*, 315 N.W.2d 597, 598 (Minn.1982). As the trial court in the present case noted, where state legislation effects simple economic protectionism, a virtually per se rule of invalidity is applied. *Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978). "Applying the same test to Defendants['] tax provision prior to the 1982 Amendment at issue before this court,"

said the trial court, "it could be assumed that the statutory provision, conditioned solely on plant location in Colorado, would have been invalidated on the same grounds."

At the same time as this litigation arose, a market was developing for alcohol derived from Colorado agricultural and forest products, as intended by the General Assembly. The first gas station in Colorado offering gasohol opened in May 1979. In 1980, four million gallons of gasohol were sold in Colorado. One hundred percent of the fuel-grade alcohol for 1980 gasohol was supplied from out of state. Archer Daniels supplied approximately 85 percent of this. The situation changed dramatically after July 1981, when the first fuel-grade alcohol qualifying for the nickel tax break was produced. By March 1982 there were eight small Colorado plants, each with a capacity of less than 3 million gallons of alcohol, producing fuel-grade alcohol for the gasohol market. Archer Daniels' Colorado sales dropped precipitously. Although in 1981 more than twice as much gasohol was sold in Colorado as in 1980, Archer Daniels' sales in 1981 dropped from 210,958 gallons before July to 20,301 gallons—one sale—after July. Archer Daniels made one more sale of approximately the same magnitude in early 1982.

The situation facing the legislature in early 1982 was as follows: Colorado fuel-grade alcohol production capacity was rising from zero in 1980 toward a level equal to all of Colorado's consumption of gasohol.[1] In addition to the eight operating fuel-grade alcohol plants, eleven more were planned, under construction, or operational but not producing. Each of the eleven had an annual production capacity of three million gallons or less, except one with a

1. The record contains several indications of this. Production in March 1982 was placed at 2.8 million gallons a year. The capacity of the eight operating plants was just under five million gallons a year. Agland, a rural cooperative and a major marketer of gasohol, stated in September 1982 that all of the fuel-grade alcohol that it had purchased since mid-1981 had been produced in Colorado. The director of purchasing for the state of Colorado indicated that Colorado producers supplied thirty percent of state gasohol purchases for which bids were taken in the fall·of 1981. A Colorado fuel-grade alcohol trader reported that approximately thirty percent of her purchases between May 1982 and November 1982 were from Colorado sources.

planned capacity of 17 million gallons.[2] Full production at these plants would yield a five-fold increase in Colorado fuel-grade alcohol capacity. Out-of-state fuel-grade alcohol not eligible for the nickel tax break had captured 100 percent of the Colorado market in 1980, but by early 1982 its market share was substantially less. Archer Daniels' share of the market dropped from 85 percent in 1980 to a minuscule proportion by early 1982.

Although the nickel tax break had indeed created increased markets for Colorado agricultural products in accordance with express legislative intent, creating capacity sufficient to meet foreseeable needs, the Minnesota Supreme Court decision in *Archer Daniels Midland Co. v. State* represented a threat to the subsidy that this new Colorado industry enjoyed. This present lawsuit was pending in Colorado to invalidate the nickel tax break on the same constitutional grounds that had proved meritorious in the Minnesota case. The General Assembly considered legislation to modify the nickel tax break in early 1982.

House Bill 1188, introduced on February 4, 1982, would have limited the nickel tax break to gasoline blended with fuel-grade alcohol manufactured by facilities producing 3 million gallons of alcohol or less per year, eliminating the express condition that the alcohol be manufactured in Colorado. This new criterion would have allowed all eight operating Colorado fuel-grade alcohol plants to continue to enjoy the nickel tax break. Since Archer Daniels' smallest plant had a capacity of 52 million gallons per year, it would have excluded the 75 percent of nationwide sales represented by Archer Daniels, plus the sales of at least four other large out-of-state suppliers, from the subsidy enjoyed by every Colorado producer.[3]

The committee hearings on House Bill 1188 are replete with expressions of a protectionist purpose behind the bill. Representative Younglund, who introduced the bill, stated that, "[t]he point is that the big ones—the ones that are going to be sending alcohol into the state of Colorado, they're not going to be many of them that's only producing three million interested in bringing alcohol in to the state of Colorado." Senator Yost observed that,

[d]ue to the recent Supreme Court lawsuit that has been challenged by ADM which is a large producer of alcohol back East, that it is probably going to be ruled in favor that we cannot discriminate against alcohol that is produced in Colorado [sic] as opposed to alcohol that is produced in other states. I think with the 3-million gallon limitation in there, that we more squarely address those plants in Colorado that would be producing the alcohol as opposed to the large conglomerates that may reside other than in the U.S.

In response to a question by Senator Yost, Representative Younglund, appearing before the Senate Committee, testified that "there are no plants in Colorado at this time, or look like they will be on line very soon that produce more than 3 million gallons." Younglund later said, "we're after the ones outside of state to find a way that a producer of 150 million gallons of alcohol doesn't come in here and get our incentive, it's an incentive for Colorado-produced alcohol—for the benefit of this state."

Senator Meiklejohn observed, "I see what you're trying to accomplish—encourage the use of gasohol, the other is encourage Colorado industry." When one witness testified in favor of eliminating the capacity restriction in order to allow the construction of large-scale plants, Meiklejohn noted, "[y]ou're also allowing for that alcohol to be imported into the state." As he viewed the measure, "we're trying to encourage the building of these facilities through incentives and further the alcohol

---

2. Testimony indicated that this plant would primarily use Colorado feedstock, but market part of its product to neighboring states.

3. The fuel-grade alcohol trader testified that there were approximately 60 small-scale out-of-state suppliers who satisfied the new criterion as of late 1982.

industry in the state of Colorado ...." "One of the goals of the bill is to use Colorado grain in alcohol ...."

The Senate Committee heard the testimony of the vice president of a company planning the construction of a Colorado fuel-grade alcohol plant with a capacity of 17 million gallons per year—14 million gallons more than any other existing or planned Colorado plant. He testified that plants producing between ten million gallons and fifty million gallons per year are far more efficient than smaller plants. Senator Powers argued that the nickel tax break should be extended to this company:

> If someone is willing to put money into building these plants, which are going to consume and make a better market for Colorado grain, and also produce alcohol from Colorado grain here in Colorado, I don't think we should put any disincentive, I don't care how insignificant—into discouraging this guy ....

During the hearing the Senate amended the bill and the House acceded to the change. The final version extended the nickel tax break to "blended gasoline which is produced from no more than three million gallons of alcohol annually from each facility having a design production capacity of seventeen million gallons or less per year ...." Thus, the General Assembly preserved the nickel tax break for *every* current and prospective fuel-grade alcohol producer in Colorado, while continuing to avoid subsidization of the overwhelming majority of fuel-grade alcohol production capacity outside this state.

## II.

Article I, section 8, clause 3 of the United States Constitution vests in Congress the power to regulate commerce among the several states. In the absence of action by Congress, the courts have interpreted the Commerce Clause as a limitation on "the power of the States to erect barriers against interstate trade." *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 35, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980); *see Cooley v. Board of Wardens*, 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1851). Where a state law explicitly discriminates against interstate commerce, courts apply a virtually per se rule of invalidity. *Philadelphia v. New Jersey*, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978); *see Matthews v. Department of Revenue*, 193 Colo. 44, 562 P.2d 415 (1977); *Archer Daniels Midland Co. v. State*, 315 N.W.2d 597 (Minn.1982).

Here, however, the General Assembly has enacted a facially-neutral provision. When the purpose and effect of a facially-neutral law are discriminatory, or even when the effect alone is discriminatory, the burden falls on the state to justify the discrimination in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake. *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 350–53, 97 S.Ct. 2434, 2445–47, 53 L.Ed.2d 383 (1977). Where a law regulates even-handedly to effectuate a legitimate local public purpose, and its effects on interstate commerce are only incidental, the burden shifts and the law will be upheld unless the burden imposed is clearly excessive in relation to the local benefits, depending again on the nature of the local interest and whether it could be promoted as well with a lesser impact on interstate activities. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).[4] Thus, the constitutionality of this facially-neutral statute depends on its purpose, its effect, the putative local benefits it confers, and the existence of less restrictive alternatives.

The Attorney General enumerates an extensive array of possible purposes for the capacity limitation: to promote the use of

---

**4.** The majority invokes the Colorado doctrine that acts of the General Assembly are presumed constitutional unless proven otherwise beyond a reasonable doubt. However, this formula has never, to my knowledge, been applied by the United States Supreme Court in a Commerce Clause case. It is inconsistent with the burdens of proof set forth in *Hunt* and *Pike*. Therefore, I would not apply it to the present case.

gasohol in Colorado, to provide incentives for development of a fuel-grade alcohol industry in Colorado, to provide benefits to Colorado farming communities in the form of employment and new markets for surplus agricultural products, to provide for increased sources of alcohol, to reduce air pollution, to decrease dependence on foreign oil, and to promote competition in the fuel-grade alcohol industry. A number of these have nothing whatsoever to do with the *reduction* in the availability of the nickel tax break brought about by the capacity limitation, and those that are not discriminatory are more properly characterized as effects rather than purposes.

One need not look beyond the legislative declaration for the gasohol promotion committee and the hearings on House Bill 1188 to see that the capacity restriction was imposed "because of the ADM lawsuit" to retain "an incentive for Colorado—produced alcohol—for the benefit of this state." As I read the record, this is one of those "rare instance[s] where a state artlessly discloses an avowed purpose to discriminate against interstate goods." *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354, 71 S.Ct. 295, 298, 95 L.Ed. 329 (1951). This law "was unquestionably conceived, cut, tailored and amended to accomplish a particular purpose[,]" i.e., to exclude every out-of-state, large-scale, efficient producer of fuel-grade alcohol from the benefits of the nickel tax break while preserving those benefits for every Colorado producer, and the "thin veneer of language used to 'get around' the constitutional prohibition, and to give the measure a mask of general application, falls from the face of the bill" when the legislative history is considered. *In re Senate Bill No. 95*, 146 Colo. 233, 239, 361 P.2d 350, 354 (1961). "The commerce clause forbids discrimination, whether forthright or ingenious." *Best & Co. v. Maxwell*, 311 U.S. 454, 455, 61 S.Ct. 334, 335, 85 L.Ed. 275 (1940). "What is ultimate is the principle that one state in its dealings with another may not place itself in a position of economic isolation. Formulas and catchwords are subordinate to this overmastering requirement." *Baldwin v.*

*G.A.F. Seelig, Inc.*, 294 U.S. 511, 527, 55 S.Ct. 497, 502, 79 L.Ed. 1032 (1935). I would conclude that the capacity limitation was animated by an unconstitutionally discriminatory purpose.

With regard to the effect of the capacity limitation, "[i]f the effect of a state regulation is to cause local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market ... the regulation may have a discriminatory effect on interstate commerce." *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 126 n. 16, 98 S.Ct. 2207, 2214 n. 16, 57 L.Ed.2d 91 (1978). Under the capacity limitation, *every* Colorado producer of fuel-grade alcohol continued to enjoy the nickel tax break it had benefited from under the earlier, patently discriminatory law. *Every* producer excluded by the capacity restriction was an out-of-state producer, and these producers comprise somewhere in excess of three-quarters of the national market for fuel-grade alcohol, the proportion represented by Archer Daniels alone. A succinct characterization of the effect of the capacity limitation provision was provided in the record by an employee of a gasohol distributor, who said, "[t]he prior statute basically did the same thing. It allowed the 5 cent tax break on in-state alcohol.... [M]ost of the competition was eliminated by the statute both prior and after."

Since I would hold that the capacity limitation was discriminatory in both purpose and effect, it follows from *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 350–53, 97 S.Ct. 2434, 2445–47, 53 L.Ed.2d 383 (1977), that the burden is on the state to justify it in terms of local benefits and the unavailability of nondiscriminatory alternatives. Although the Attorney General refers to many possible purposes underlying the capacity restriction, the primary local benefit said to accrue is a reorientation of production away from industrial complexes to rural communities. The Attorney General's brief states:

Dramatic price increases in gasoline led farmers to look to alternative fuel sources. Alcohol is appealing because it is produced from agricultural commodities and alcohol plants are suitable to rural communities where feedstock is available for production. Establishment of plants in rural communities creates an alternative fuel source and also creates new jobs in those communities to help stem the loss of population typical of rural communities.... Colorado plants uniformly have been built or planned for rural communities outside of the established metropolitan areas of the state....

Large capacity alcohol plants, such as those operated by Archer Daniels, are not feasible to build in rural Colorado communities.

This analysis of benefits, which finds expression in the record only in Senator Noble's statement that "I kind of want to keep some of those farmers out there in those fields cause I'd kind of like to have something to eat as we go down the road" and in the testimony of three witnesses involved in gasohol production and distribution, stands in stark contrast to the avowedly discriminatory view of benefits pervading the legislative history and apparent from the record. A fuel-grade alcohol trader testified that small-scale Colorado plants could satisfy their demand for feedstock locally, i.e., in Colorado, and would find it advantageous to do so because of the high cost of transporting feedstock. She had never ordered small-plant, fuel-grade alcohol from more than 419 miles away without a backhaul, and 564 miles away with a backhaul. A gasohol distributor testified that transportation costs had deterred him from ordering fuel-grade alcohol from small-scale out-of-state plants. The legislative hearings revealed that planned Colorado fuel-grade alcohol capaci-

ty would grow rapidly. There was testimony that Archer Daniels' transportation costs for shipments to Colorado from the Midwest were more than twice as high as the transportation costs of the local producers.[5] The picture that emerges from this evidence is a fuel-grade alcohol industry, which, by means of subsidy to small local plants, converts Colorado feedstock to fuel-grade alcohol in Colorado facilities in sufficient quantity to satisfy the Colorado demand for gasohol. Hence the subsidization of small-scale plants in rural Colorado communities inevitably burdens interstate commerce. In line with *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), and *Boston Stock Exchange v. State Tax Commission*, 429 U.S. 318, 97 S.Ct. 599, 50 L.Ed.2d 514 (1977), I would hold that the state has not justified this discrimination in terms of local benefits.

It should also be noted that Archer Daniels has listed what may be less restrictive alternatives to achieve the same benefits, including extension of the property tax relief for gasohol plants already conferred by § 39–1–104(13) & (14), 16B C.R.S. (1982), and state industrial revenue bonds. The record discloses that industrial revenue bonds would have provided the funding for at least one proposed fuel-grade alcohol plant.

The majority notes that if restrictions on the nickel tax break were eliminated, that would give rise "to the possibility of a significant loss of revenue to the Highway Users Tax Fund unless application of the tax break was limited in some other manner." Taking the reduction in revenue losses as a local benefit conferred by the capacity limitation, it is apparent that many less restrictive alternatives would have achieved the same end. These include reduction in the amount of the tax break per gasohol gallon, a ceiling on the total

---

**5.** The vice president of the company planning the 17 million gallon Colorado fuel-grade alcohol plant reported on government studies showing that plants of capacity up to 50 million gallons, i.e., the size of Archer Daniels' plants then in operation, enjoy increasing economies of scale, which might allow Archer Daniels to overcome higher transportation costs. Two other witnesses confirmed the existence of economies of scale in the manufacture of fuel-grade alcohol.

amount of the tax break with benefits to be allocated on a first-come first-served basis or through nondiscriminatory quotas or by some other means, and curtailment of other subsidies and government sales guaranteed to gasohol, to suggest only a few. Here again, I would conclude that the state has failed to justify the capacity restriction in terms of local benefits and the absence of less restrictive alternatives.

In conclusion, I would hold that the capacity provision in question is discriminatory in both purpose and effect, and the state has failed to justify it in terms of local benefits flowing from the statute and the absence of less restrictive alternatives. Therefore I would reverse the judgment of the district court holding this law to be consistent with the Commerce Clause.

ERICKSON, C.J., and NEIGHBORS, J., join in this dissent.

