**CLOVERLEAF KENNEL CLUB, INC., a Colorado Corporation, and Rocky Mountain Greyhound Park, Inc., a Colorado Corporation, Petitioners,**

v.

**COLORADO RACING COMMISSION and Mile High Kennel Club, Inc., Respondents.**

**No. 79SC41.**

Supreme Court of Colorado,
En Banc.

Dec. 15, 1980.

---

Cogswell, Chilson, Dominick & Whitelaw, James E. Heiser, John H. Chilson, Denver, for Cloverleaf Kennel Club, Inc.

Rector, Retherford & Mullen, Leo W. Rector, Colorado Springs, for Rocky Mountain Greyhound Park, Inc.

J. D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., Jeffrey G. Pearson, Asst. Atty. Gen., Denver, for Colorado Racing Commission.

Rothgerber, Appel & Powers, James M. Lyons, Denver, for Mile High Kennel Club, Inc.

DUBOFSKY, Justice:

Petitioners Cloverleaf Kennel Club, Inc. (Cloverleaf) and Rocky Mountain Greyhound Park, Inc. (Rocky Mountain) petitioned for review of the court of appeals' decision in *Cloverleaf Kennel Club, Inc. v. Colorado Racing Commission,* 42 Colo.App. 13, 592 P.2d 1341 (1979). We granted certiorari and now affirm the court of appeals' judgment.

In 1977, the General Assembly enacted a bill increasing the duration of race meets for animals other than horses from thirty to thirty–five days. *See* section 12–60–107(1), C.R.S. 1973 (1978 Repl. Vol. 5).[1] The amendment became effective on July 1, 1977. On September 27, 1977, the respondent Mile High Kennel Club, Inc. (Mile High), which had concluded its licensed 1977 racing meets on August 29th, peti-

tioned the other respondent, the Colorado Racing Commission (Commission), for an allotment of eight of the additional annual racing days created by the amendment. Mile High's petition alleged that the requested allotment was authorized by section 12–60–106(8), C.R.S. 1973 (1978 Repl. Vol. 5), which provides:

"Upon petition by the licensee and a finding by the commission that it is impossible or impractical for a licensee because of fire or act of God or other unforeseeable emergency not caused or participated in by the licensee, to conduct a race meet upon the dates allocated or upon a race track designated by the commission to the licensee, other dates may be substituted and granted to the licensee. A licensee so petitioning may be granted the right to lease and utilize any other licensee's facilities for the term of the petitioning licensee's annual permit or any portion thereof, but said grant shall not be construed to allow any licensee more days of racing in any year than are prescribed by this article."

The additional racing dates requested by Mile High (December 21, 22, 23, 26, 27, 28, 29 and 30, 1977) did not conflict with any racing days allotted to Cloverleaf or Rocky Mountain. *See* section 12–60–108(5), C.R.S. 1973 (now in 1978 Repl. Vol. 5).[2]

The Commission held a hearing on Mile High's petition on October 11, 1977. Cloverleaf and Rocky Mountain appeared in opposition. At the conclusion of the hearing, the Commission found that an emergency existed and granted Mile High's request for eight additional racing dates during December, 1977.

On November 8, 1977, the petitioners filed a petition in Denver District Court seeking judicial review of the Commission's decision under C.R.C.P. 106(a)(4). They al-

---

1. Colo.Sess.Laws 1977, ch. 172 at 759. Since licensees are permitted to conduct two meets each calendar year, section 12–60–107(1), the 1977 bill authorized an allotment of ten additional racing days/year to licensees.

2. Section 12–60–108(5) provides in pertinent part:

"In making such allotment of dates, the commission shall ... [avoid] whenever possible, conflicts in racing dates between race tracks conducting racing of the same type of animals...."

leged that the Commission's allotment of additional racing days to Mile High was in excess of the "emergency" powers conferred on it by section 12–60–106(8). The court directed the Commission to show cause why the relief requested by the petitioners should not be granted. The respondents then filed motions to dismiss the petition and quash the order to show cause, arguing, first, that inasmuch as the petitioners had an adequate and exclusive remedy under section 24–4–101, *et seq.*, C.R.S. 1973 (the State Administrative Procedure Act; APA), the court lacked jurisdiction to review the Commission's action under C.R.C.P. 106(a)(4) and, second, that the petitioners, as economic competitors of Mile High, lacked standing to challenge the Commission's action. On December 13, 1977, the petitioners moved for leave to amend their C.R.C.P. 106(a)(4) petition to add a second claim for relief under section 24–4–106, C.R.S. 1973 (1979 Supp.).

On December 21, 1977, the petitioners' motion to amend their petition to add a claim for judicial review under the APA was denied as untimely because it had been filed more than thirty days after the date on which the agency action complained of became effective. Section 24–4–106(4), C.R.S. 1973 (1979 Supp.). The respondents' motions to dismiss the C.R.C.P. 106(a)(4) action were granted on the ground that Cloverleaf and Rocky Mountain, as economic competitors of Mile High, lacked standing to challenge the lawfulness of the Commission's allotment of additional racing days to Mile High.[3]

The petitioners appealed the dismissal of their action to the court of appeals. The court affirmed the ruling below, holding that economic injury from lawful competition does not confer standing to challenge agency action; that the petitioners failed to show that they were "adversely affected or aggrieved" within the meaning of either C.R.C.P. 106(a)(4) or section 24–4–106; and that, even if it were assumed that the petitioners sustained an injury as a result of

the Commission's action, the harm was too incidental and indirect to constitute an actionable injury under *Wimberly v. Ettenberg*, 194 Colo. 163, 570 P.2d 535 (1977).

We then granted the petitioners' petition for certiorari and now affirm the court of appeals' judgment dismissing the appeal on the ground that the petitioners lack standing to challenge the Commission's action. However, we disapprove the language in the opinion below suggesting that injury from lawful competition can never confer standing to challenge the legality of agency action.

## I.

▮▮▮ The respondent Commission asks us to dismiss the petitioners' appeal as moot. We decline to do so. While it is true that any injury sustained by petitioners is, as a practical matter, irremediable, and although it is equally true that the precise factual circumstances in which this controversy arose are unlikely to recur, the underlying substantive question is one "capable of repetition yet evading review." *Rocky Mountain Association of Credit Management v. District Court*, 193 Colo. 344, 345, 565 P.2d 1345, 1346 (1977). The breadth of the Commission's statutory authority to award additional racing dates to a licensee under section 12–60–106(8), C.R.S. 1973 (1978 Repl. Vol. 5) may again be drawn into question by petitions reciting that the applicant has been prevented from conducting a race meet because of an emergency or act of God. Were challenges to the Commission's disposition of these petitions mooted by the expiration of the calendar year in which additional days were requested or awarded, the Commission's or trial courts' interpretations of section 12–60–108(6) would evade appellate scrutiny. Under these circumstances, "a court may elect to settle the controversy so as to establish a precedent for future action by trial courts." *Rocky Mountain Association of Credit Management v. District Court, supra.*

---

3. The district court did not expressly decide whether it possessed or lacked jurisdiction to review the Commission's action under C.R.C.P. 106(a)(4).

## II.

The respondents also ask us to dismiss the petitioners' appeal on the ground that our jurisdiction to review agency action was never timely invoked under section 24–4–106(4), C.R.S. 1973 (1979 Supp.).[4] We disagree and hold that the trial court erroneously dismissed petitioners' motion to amend their C.R.C.P. 106(a)(4) petition to add a claim for relief under the APA.

█ Our disposition of this matter is guided by *People v. District Court*, Colo., 612 P.2d 87 (1980), in which we rejected a virtually identical challenge to the timeliness of a motion to amend a C.R.C.P. 106(a)(4) petition to state a claim for relief under the APA. Here, Cloverleaf and Rocky Mountain filed a C.R.C.P. 106(a)(4) petition less than thirty days after the date of the Commission's decision; the only amendment requested by the petitioners was one bringing their claim for relief within the APA by substituting an invocation of the district court's jurisdiction under section 24–4–106 for the erroneous reference to C.R.C.P. 106(a)(4); as amended, the pleadings stated a claim for judicial review identical in all substantive respects to that stated in the original petition. Therefore, although the motion to amend was filed approximately one month after the thirty–day period prescribed by section 24–4–106(4), C.R.S. 1973 (1979 Supp.), had expired, leave to amend should have been granted under C.R.C.P. 15(a) and, because the amended pleading related back to the date on which the original petition was filed, C.R.C.P. 15(c), the pleading, as amended, stated a timely claim for judicial review under the APA. *People v. District Court, supra.*

Although the district court erroneously denied the petitioners' motion for leave to amend their petition to add a claim for relief under the APA, it is unnecessary to remand the case to that court. The standing questions raised by the petitioners are not affected by the pleadings amendment; they are questions of law which may be resolved on the record presently before us.

## III.

Cloverleaf and Rocky Mountain contest the decision of the court of appeals that they lacked standing to challenge the Commission's allotment of eight additional racing days to Mile High. While we agree with the court of appeals' conclusion and hold that the petitioners are without standing to challenge the Commission's action, we disapprove of those portions of the lower court's opinion which predicate the denial of standing on *Kornfeld v. Perl Mack Liquors, Inc.*, 193 Colo. 442, 567 P.2d 383 (1977), and *Woda v. City of Colorado Springs*, 40 Colo.App. 173, 570 P.2d 1318 (1977).

The general law of standing in this state was summarized in *Wimberly v. Ettenberg, supra.* In *Wimberly* we explicitly declined to adopt the standing doctrines propounded by the United States Supreme Court in *Association of Data Processing Organizations v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and its progeny.[5] *Data Processing* devised a two–pronged test of standing: (1) the plaintiff must allege that the challenged action has caused him injury in fact; (2) the interests sought to be protected must arguably be within the zone of interests to be protected or regulated by the statute in question. Because it conceived of

---

4. The court of appeals did not reach this issue. However, we choose to dispel any doubts concerning our jurisdiction to decide the standing questions raised by the petitioners' petition for certiorari.

5. *See, e. g., Barlow v. Collins*, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Duke Power Com-*

*pany v. Carolina Environmental Study Group*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). While these cases do not articulate a coherent body of standing law, *see generally K. Davis, Administrative Law of the Seventies* (1976) § 22.00–22.21 and 3 *K. Davis, Administrative Law Treatise* (1958) (1980 Supp.) § 22.-00–22.20, they consistently adhere to the view that standing is to be determined separately from the merits questions raised by a plaintiff's claim for relief.

standing as a threshold question, to be decided preliminarily to and independently of the merits of the underlying controversy, the *Data Processing* court repudiated its earlier "legal interest"[6] standing test as a premature inquiry into matters reserved for a decision on the merits. *Wimberly*, however, did not draw this distinction between standing and merits questions:

> "In *Data Processing, supra,* and its progeny, the Supreme Court of the United States characterized the standing inquiry as being separate from the merits of the case. As noted above, it was for this reason that the 'legal interest' test was replaced by the zone of interest test. In our view, *a decision on the merits is always inextricably tied to every case which involves the issue of standing. When standing is in issue, the broad question is whether the plaintiff has stated a claim for relief* which should be entertained in the context of a trial on the merits.
>
> \*    \*    \*    \*    \*    \*
>
> The proper inquiry on standing is whether the plaintiff has suffered injury in fact to a legally protected interest as contemplated by statutory or constitutional provisions."

194 Colo. at 168, 570 P.2d at 539 (emphasis added). *Wimberly's* characterization of standing as a *merits* question is consonant with a substantial body of commentary criticizing post–*Data Processing* federal standing decisions. One leading commentator has noted:

> "Standing, in looking to injury or recognizable harm, quite obviously deals with an essential element of a claim. In addressing protected legal interest it poses the counterpart of the familiar private

claim questions: whether the defendant had a duty to the plaintiff, whether he had an obligation to act or refrain from acting in certain ways and whether his conduct was a legal cause of the plaintiff's injury. *All of these are matters concerned with whether a plaintiff has stated a claim for relief; they are resolved by reference to the meaning and purposes of the law relevant to the merits.* The answer to the question who may sue is a by–product of this determination."

Albert, *Standing to Challenge Administrative Action: An Inadequate Surrogate for Claim for Relief,* 83 *Yale L.J.* 425, 428–29 (1974) (emphasis added).[7]

Abandonment of *Data Processing's* rigid, threshold view of standing does not necessitate a full–scale trial on the merits before standing disputes may be resolved. The question whether a plaintiff has stated a claim for relief–i. e., pled facts which, if proven, would constitute an actionable injury under the relevant substantive law–may be decided, as a matter of law, antecedently to an adjudication of the remaining merits questions (these include any disputed issues of fact as well as such mixed questions as causation and justification of official action). *See Wimberly v. Ettenberg, supra,* 194 Colo. at 168, 570 P.2d at 539; *Albert, Standing to Challenge Administrative Action, supra,* at 431–32; C.R.C.P. 12(b)(5); *see also United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (discovery and summary judgment, not dismissal under F.R.C.P. 12, are the appropriate procedures for disposing of well–pled but unproven allegations of injury and causation).

---

**6.** Under the legal interest test, a plaintiff had standing to challenge government action if and only if he had sustained an injury in fact to a "legal right–one of property, one arising out of contract, one protected against tortious invasion, or *one founded on a statute* which confers a privilege...." *Tennessee Electric Power Company v. Tennessee Valley Authority,* 306 U.S. 118, 137–38, 59 S.Ct. 366, 368, 369, 83 L.Ed. 543, 549 (1938) (emphasis added).

**7.** *See, e. g., D. Currie, Federal Courts* (2d ed. 1975); *P. Bator, P. Mishkin, et al., Hart & Wechsler's Federal Courts & the Federal System* (2d ed. 1973); *Albert, Justiciability and Theories of Judicial Review: A Remote Relationship,* 50 *S.Cal.L.Rev.* 1139 (1977); *Tushnet, The New Law of Standing: A Plea for Abandonment,* 62 *Corn.L.Rev.* 663 (1977); *Roberts, Fact Pleading, Notice Pleading and Standing,* 65 *Corn.L.Rev.* 390 (1980).

The standing doctrines formulated in *Wimberly* guide us here: we must ascertain whether the petitioners' complaint that the Commission favored Mile High over them by allotting to Mile High more racing days than were allotted to the petitioners states a claim for relief under the provisions of section 12–60–100.2, *et seq.*, C.R.S. 1973 (now in 1978 Repl. Vol. 5) (Racing Act). More particularly, we must inquire whether the petitioners' complaint sufficiently alleges that they sustained an injury in fact to an interest which, as a matter of law, is entitled to legal protection under that Act.

It should be noted at the outset that the petitioners have not expressly alleged direct[8] economic losses or injuries traceable to the Commission's action. They claim that Mile High was "favored over" them and permitted to race on more days than they were, but do not claim that they suffered any out–of–pocket or other pecuniary losses as a result of this allotment of additional days to a competitor. Moreover, as the court of appeals observed, direct, palpable economic injury cannot logically be inferred from the simple, undisputed allegation that Mile High was allotted more racing days than were the petitioners. The petitioners did not themselves apply for additional days nor were they licensed to operate on any of the days awarded to Mile High. *See* section 12–60–108(5), C.R.S. 1973. Under these circumstances, the additional racing days allotted to Mile High could not affect the petitioners' revenues from their 1977 seasons. Similarly, although it is not inconceivable that the races Mile High staged in late December, 1977, may have discouraged patronage at the petitioners' 1978 meets, any such inferred injury is both too speculative and too indirect to be actionable. *Wimberly v. Ettenberg, supra.* Therefore, even if we were to construe the Racing Act to protect licensees against competitive economic injury, the petitioners failed to allege that they suffered the economic harm essential to state a claim for relief against the Commission.

The court of appeals ruled that economic injury from lawful competition can never confer standing to challenge the legality of agency action. While *Kornfeld v. Perl Mack Liquors, Inc., supra,* and *Woda v. City of Colorado Springs, supra,* denied standing to liquor licensees seeking appellate or judicial review of decisions granting licenses to competitors, the predicate for those decisions was not a *per se* rule that actual or threatened economic injury is never actionable, but recognition that the Colorado Liquor Code, section 12–47–101, *et seq.*, C.R.S. 1973 (now in 1978 Repl. Vol. 5), does not protect existing licensees from economic competition. *See* section 12–47–106(2), C.R.S. 1973; *Lab Development Company v. Hill,* 152 Colo. 338, 381 P.2d 811 (1963). While the economic impact of lawful competition may, as a practical matter, inflict an injury, it cannot confer standing under *Wimberly* unless the economic interest harmed is protected by a statutory or constitutional provision–i. e., unless a legislative intent to protect economic interests from competitive harm is explicit or fairly inferable from the statutory provisions under which an agency acts or if the legislature expressly confers standing on competitors to seek review of agency action. *See The Chicago Junction Case,* 264 U.S. 258, 44 S.Ct. 317, 68 L.Ed. 667 (1924); *Hardin v. Kentucky Utilities Company,* 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968); *see also F.C.C. v. Sanders Bros. Radio Station,* 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940) (holding that the Communications Act of 1934 conferred standing on economic competitors to sue to vindicate the public interest). However, as we have observed above, the petitioners' failure to sufficiently allege competitive economic injury resulting from the award of additional racing days to Mile High obviates the necessity of reaching that question of statutory construction in this case.

Petitioners, in their reply brief to this court, argue that their right to relief–and,

8. In the absence of statutory protection against indirect pecuniary damage, *Wimberly v. Ettenberg, supra,* holds that indirect or incidental economic harm is not an actionable injury. 194 Colo. at 168, 570 P.2d at 539.

therefore, their standing to challenge the Commission's action–is based not on economic injury but on the invasion of their statutory right as licensees to allotment of an "equal number" of racing days.

■ It is now well settled that the injury in fact conferring standing may not only be intangible, *see Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), but "may exist *solely* by virtue of 'statutes creating legal rights the invasion of which creates standing.'" *Warth v. Seldin, supra*, 442 U.S. at 501, 95 S.Ct. at 2206, 45 L.Ed.2d at 355 (emphasis added); *see Trafficante v. Metropolitan Life Insurance Company*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972); *Dodge v. Department of Social Services*, Colo., 600 P.2d 70 (1979). The conclusion that an injury is actionable "rests on a normative judicial judgment ... derived from a determination [that] *the substantive law invoked creates a personal interest or right in the complainant* that has been infringed by the challenged action." *Albert, Justiciability and Theories of Judicial Review, supra* at 1151 (emphasis added). Where, as here, the statutes under which the agency has acted do not explicitly specify what counts as an actionable injury, the law of implied private rights of action furnishes a model for our judgment whether the substantive law creates rights the invasion of which confers standing under the APA. *Albert, Standing to Challenge Administrative Action, supra* at 451–56; *Tushnet, supra* at 672–73; *Roberts, supra* at 432–33.

Although its continuing vitality in the federal courts has been drawn into question by several recent United States Supreme Court decisions, *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), suggests useful guidelines for determining whether a plaintiff alleging an invasion of a statutory right has suffered an actionable injury entitling him to judicial review. *Cort* states:

"In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First ... does the statute create a ... right in favor of the plaintiff?

Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? ... Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?" 422 U.S. at 78, 95 S.Ct. at 2088, 45 L.Ed.2d at 36.

Applying these guidelines to the provisions of the Racing Act, we must first inquire whether, as the petitioners contend, the Act entitles each licensee to an allotment of an "equal number" of racing days. Section 12–60–108(5), C.R.S. 1973, provides:

"[T]he commission shall allot and assign to the respective applicants [for renewal of their licenses] ... dates for racing meets and dates for racing within the meet and the number of races on such dates. *In its sound discretion, the commission may allot a different number of racing days to the several applicants....* In making such allotment of dates, the commission shall do so in its sound discretion ... after giving due consideration to all factors involved, including the interests of the respective applicants and the public and the best interests of racing and avoiding, whenever possible, conflicts in racing dates between race tracks conducting racing of the same types of animals...."

(Emphasis added.) This section unequivocally empowers the Commission, *in its sound discretion*, to allot a *different* number of racing days to the several applicants for license renewals. Thus, contrary to the petitioners' reading of the Racing Act, licensees possess no unqualified right to allotment of an "equal number" of racing days under section 12–60–108(5).

■ However, the Commission's discretion to allot racing days among applicants is neither unfettered nor unreviewable. For a standing inquiry, the pertinent questions raised by section 12–60–108(5) and other provisions of the Racing Act are whether the statutory constraints imposed on the Commission's discretion were enacted to benefit licensees in the petitioners' positions and whether denial of a judicial forum to

the petitioners and others similarly situated would frustrate the legislative purposes implicit in those constraints.

Section 12–60–108(5) is intended to guide the exercise of the Commission's discretion to allot racing days among applicants seeking renewal of their licenses. As the beneficiary of this provision, an applicant allotted fewer days than another applicant suffers an actionable injury entitling him to judicial review as a person adversely affected by agency action within the meaning of the APA. Whether this unequal allotment is, in fact and law, an abuse of the Commission's discretion is the remaining merits question to be decided by the reviewing court.

The petitioners, however, do not challenge the Commission's disposition of *their* applications for license renewal for the 1977 calendar year. Instead, they object to the Commission's allotment of additional days to Mile High under the "emergency" provision of section 12–60–106(8), C.R.S. 1973 (1978 Repl. Vol. 5).

Section 12–60–106(8) is intended to benefit licensees who, without fault, have been unable to utilize the full number of racing days allotted to them by their licenses. Had the petitioners themselves petitioned for and been denied additional days under section 12–60–106(8), they would be "adversely affected" within the meaning of the APA and entitled to judicial review of the Commission's actions. However, they did not do so. Instead, they apparently interpret sections 12–60–108(5) and 12–60–106(8), read together, as a broad limitation on the Commission's discretion to take *any* action bestowing an advantage on one licensee which is not simultaneously bestowed on the others. No such sweeping legislative restraint on Commission discretion and corresponding protected right are fairly inferable from the Racing Act.

■ Nor is there any evidence that the General Assembly intended to grant licensees as a class a roving commission to police the legality of Commission actions. While the Commission's discretion to regulate racing and to allot racing days to applicants under section 12–60–108(5) and section 12–60–106(8) is circumscribed, the legislative policies underlying those provisions may be adequately effectuated by actions for judicial review brought by licensees dissatisfied with the Commission's disposition of their license renewal applications or section 12–60–106(8) petitions. Moreover, should a Commission decision benefitting a licensee exert a direct, adverse economic effect on a competitor which had not itself sought a similar benefit, we do not here preclude that competitor from challenging the Commission's decision.[9] We now decide only that a licensee who has neither been denied an allotment of additional days pursuant to section 12–60–106(8), C.R.S. 1973 (1978 Repl. Vol. 5), nor suffered direct and palpable economic harm as a result of Commission action allotting additional days to another licensee under that subsection, lacks standing to challenge the Commission's action as an invasion of an interest impliedly protected by the Racing Act.

For these reasons we hold that the petitioners have not suffered an actionable injury as a result of the Commission's approval of Mile High's petition and hence lack standing to seek review of that action under section 24–4–106, C.R.S. 1973. The judgment of the court of appeals dismissing petitioners' appeal is therefore affirmed.

---

9. If, for example, the Commission grants conflicting racing dates to a petitioner under section 12–60–106(8), a licensed competitor who had already been allotted those dates may have standing to challenge the legality of the Commission's action.