2015 COA 127

1405 HOTEL, LLC; 550 15th Owner, LLC; Broadmoor Hotel Inc.; Brown Palace Hotel Associates Limited Partnership; Cheyenne Mountain Conference Resort; CHSP Denver LLC; DiamondRock Cherry Creek Tenant LLC; DiamondRock Denver Downtown Tenant LLC; HEP Denver Ltd., d/b/a Magnolia Hotel; Oxford Hotel 2005 Holdings LLC; and Westminster Boulevard Finance, LLC, Plaintiffs–Appellants,

v.

COLORADO ECONOMIC DEVELOPMENT COMMISSION, Division of the Office of Economic Development and International Trade, State of Colorado; and City of Aurora, Colorado, Defendants–Appellees.

Court of Appeals No. 14CA1613

Colorado Court of Appeals,
Div. I.

Announced September 10, 2015

Lewis Roca Rothgerber LLP, James M. Lyons, Hilary D. Wells, Hermine Kallman, Denver, Colorado, for Plaintiffs–Appellants.

Cynthia H. Coffman, Attorney General, LeeAnn Morrill, First Assistant Attorney General, Denver, Colorado, for Defendants–Appellees Colorado Economic Development Commission, Division of the Office of Economic Development and International Trade, State of Colorado.

Kutak Rock LLP, Thomas W. Snyder, Daniel C. Lynch, Michael M. Frandina, Denver, Colorado, for Defendant–Appellee City of Aurora.

Opinion by JUDGE TAUBMAN

¶ 1 Plaintiffs, eleven hotels along Colorado's Front Range,[1] (collectively the Hotels)

1. The plaintiffs are 1405 Hotel, LLC; 550 15th Owner, LLC; Broadmoor Hotel Inc.; Brown Palace Hotel Associates Limited Partnership; Cheyenne Mountain Conference Resort; CHSP Denver LLP; DiamondRock Cherry Creek Tenant LLC; DiamondRock Denver Downtown Ten-

appeal the trial court's order dismissing their complaint against the Colorado Economic Development Commission (CEDC) and the City of Aurora (Aurora). The Hotels allege that the trial court improperly refused to review the CEDC's decision to award Aurora an $81 million tax subsidy pursuant to its authority under the Colorado Regional Tourism Act (the RTA). Because we agree with the trial court's conclusion that the Hotels lack standing to challenge the CEDC's decision, and because we do not reach their constitutional claim, we affirm.

## I. Background

### A. The Regional Tourism Act

¶ 2 In 2009, the General Assembly enacted the RTA to provide a mechanism through which as many as two local governments per year can obtain sales tax increment financing for the development of large-scale regional tourism projects. §§ 24–46–301 to –310, C.R.S.2014. The law permits successful applicants to establish regional tourism zones or authorities within their borders and allows them to collect a portion of the revenue derived from state sales taxes within those zones. See § 24–46–303, C.R.S.2014 (defining, among other terms, "regional tourism authority," "regional tourism zone," and "state sales tax increment revenue"). The revenue is then used to fund the development of a specific large-scale tourism project within the zone. See § 24–46–302(1)(c), C.R.S. 2014 ("Colorado is in competition with other states to attract large-scale regional tourism projects."); § 24–46–302(1)(d) ("It is in the interest of [Coloradans] to provide a financing mechanism for attracting, constructing, and operating large-scale regional tourism projects that will attract significant investment and revenue from outside the state.").

¶ 3 The RTA prescribes a detailed application process which requires applicants to submit, among other documents, maps of the proposed project area, § 24–46–304(2)(a), C.R.S.2014; a narrative description of the project, including cost estimates, id. at (2)(c); an economic analysis detailing the project's impact on the local economy, id. at (2)(d); and information regarding the project's financing, id, at (2)(e) to (h). The RTA also requires applicants to provide an economic study from a third-party analyst selected by the Office of State Planning and Budgeting. Id. at (2)(i). The third party reviews the data provided by the applicants to ensure the application's general accuracy. Id, at (2)(i)(I) to (IV).

¶ 4 Consideration of an RTA application is a two-step process. First, before approving a project, the CEDC must make several findings: (1) the project is extraordinary and unique in nature and reasonably anticipated to contribute significantly to economic development and tourism in the state and region where the project is located; (2) the project is reasonably anticipated to result in a substantial increase in out-of-state tourism; (3) a significant portion of the sales tax revenue generated by the project is reasonably anticipated to be attributable to transactions with nonresidents of the state;[2] and (4) in the absence of the award, the project is unlikely to be developed within the foreseeable future. Id. at (3)(a) to (d).

¶ 5 Second, section 24–46–305(3), C.R.S. 2014, requires the CEDC to adopt a resolution specifying (1) the local government that has been approved to undertake the project; (2) the area of the regional tourism zone; (3) whether the CEDC has authorized the creation of a regional tourism authority; and (4) the percentage of state sales tax increment revenue that will be dedicated to the regional tourism project.

### B. Aurora's RTA Application

¶ 6 For the purposes of this appeal, the parties do not dispute the following facts as

ant, LLC; HEP Denver Ltd., d/b/a Magnolia Hotel; Oxford Hotel 2005 Holdings, LLC; and Westminster Boulevard Finance, LLC.

**2.** After this lawsuit was filed, the General Assembly amended section 24–46–304(3)(c) to add a sentence reading: "An exception to this requirement may apply if a significant portion of the

sales tax revenue generated by the project is reasonably anticipated to be attributable to residents of the state but the revenue would otherwise leave the state due to lack of a similar project or facility in the state." Ch. 301, sec. 3, § 24–46–304(3)(c), 2014 Colo. Sess. Laws 1258.

set forth in the Hotels' second amended complaint.

¶ 7 During the RTA's inaugural application cycle in 2011, Aurora submitted a proposal requesting a tax increment subsidy to support the building of a $824 million hotel and conference center with 1500 rooms and approximately 350,000 to 400,000 square feet of meeting space to be developed by the Gaylord Entertainment Company (the Gaylord Project). The Gaylord Project's application presented a detailed description and economic analysis, including a third-party analyst's conclusion that the project would likely not be developed but for RTA funding.

¶ 8 In May 2012, the CEDC announced its intention to approve the Gaylord Project's requested $81 million tax increment subsidy, pursuant to the RTA, so long as Aurora satisfied certain conditions within 120 days.[3] However, the CEDC did not adopt a resolution memorializing the award at that time.

¶ 9 Later that same month, Gaylord Entertainment announced its decision to withdraw from the Gaylord Project. The company further announced that it was selling its brand name and management rights to Marriott International. In October 2012, Gaylord Entertainment announced that it had merged with a wholly owned subsidiary called Ryman Hospitalities.

¶ 10 One year later, during the May 2013 CEDC meeting, Aurora announced that RIDA Development Corp. (RIDA) had agreed to develop a similar hotel and conference center, and that Marriott International would operate the project (the RIDA/Marriott Project). However, Aurora did not submit a new RTA application.

¶ 11 In July 2013, the Hotels, joined by additional hotels, the Colorado Hotel and Lodging Association, and the Metro Denver Hotel Association, submitted a petition to the CEDC requesting that it require Aurora to submit a new RTA application for the RIDA/Marriott Project.[4] Specifically, it claimed that material changes to the proposed project, as well as the change in the developer from Gaylord to RIDA, necessitated a new application. The petition also requested that the CEDC hold a public hearing to address these concerns and alleged that the CEDC's May 2012 preliminary approval of the Gaylord Project had expired on its own terms.

¶ 12 At its regularly scheduled July 2013 meeting, the CEDC heard the petitioners' concerns and notified them that it would take the petition under advisement. In August 2013, the Attorney General wrote to petitioners, denying their petition on the ground that it was untimely under section 24–4–106(4), C.R.S.2014, of the State Administrative Procedure Act (APA), and C.R.C.P. 106(b). The Attorney General asserted that the CEDC's May 2012 preliminary approval of the Gaylord Project constituted final agency action, giving petitioners either thirty-five days from that date to challenge the action pursuant to section 24–46–106(4) or, in the alternative, twenty-eight days to petition for judicial review under C.R.C.P. 106(b). Because the petition was untimely under either deadline, the Attorney General denied it on behalf of the CEDC.

¶ 13 In October 2013, the CEDC adopted a final resolution approving Aurora's RTA application for the RIDA/Marriott Project.

### C. This Action

¶ 14 In September 2013, the Hotels filed this action against the CEDC and Aurora in Denver District Court. A second amended complaint was filed in October 2013. The complaint alleged four claims for relief: (1) a claim in the nature of mandamus brought

---

**3.** The RTA does not limit the amount of time a preliminary approval remains effective before the passage of the final resolution required by section 24–46–305(3), C.R.S.2014. Rather, the 120–day limit was imposed by the CEDC in the exercise of its discretion.

**4.** The Hotels never requested to participate in the administrative proceedings pursuant to section

24–4–105(2)(c), C.R.S.2014. That section of the State Administrative Procedure Act provides:

A person who may be affected or aggrieved by agency action shall be admitted as a party to the proceeding upon his filing with the agency a written request therefor, setting forth a brief and plain statement of the facts which entitle him to be admitted and the matters which he claims should be decided.

under C.R.C.P. 106(a)(2) to compel the CEDC to require Aurora to submit a new application for the RIDA/Marriott Project, as required by the RTA; (2) a claim brought pursuant to the APA, section 24–4–106(4), seeking review of the CEDC's final agency action denying their petition for reconsideration and approving the RIDA/Marriott Project; (3) a claim for declaratory relief pursuant to C.R.C.P. 57 and section 13–51–105, C.R.S.2014, challenging the constitutionality of section 24–46–309, C.R.S.2014, of the RTA; and (4) a claim seeking a declaration that procedural irregularities in the CEDC's approval of the initial Gaylord Project invalidated that RTA award.

¶ 15 In December 2013, Aurora moved for a C.R.C.P. 12(c) judgment on the pleadings, asserting that the Hotels lacked standing to bring claims one, two, and four. Aurora conceded that the Hotels had standing to bring their third claim, but maintained that this claim should be resolved in its favor on its merits. The court held a hearing in March 2014 and, in April 2014, granted Aurora's C.R.C.P. 12(c) motion in an oral ruling. In July 2014, the trial court entered a written order denying the Hotels' C.R.C.P. 59 motion.

¶ 16 On appeal, the Hotels contend that (1) the trial court erred in ruling that they lacked standing to bring their first, second, and fourth claims for relief; and (2) the court misconstrued their third claim as a facial, rather than an as applied, challenge to the constitutionality of section 24–46–309. Aurora and the CEDC maintain that the trial court correctly resolved these two issues and further assert, as a jurisdictional matter, that the Hotels' complaint was untimely under both section 24–4–106(4) and C.R.C.P. 106(b).

## II. Timeliness

¶ 17 At the outset, we address Aurora's and the CEDC's contention that the Hotels' claims, brought pursuant to C.R.C.P. 106(b) and section 24–4–106(4) were untimely, depriving the trial court of subject matter jurisdiction. Specifically, Aurora and the CEDC assert that the CEDC's May 2012 approval of the Gaylord Project constituted final agency action, at which time the Hotels had twen-

ty-eights days under C.R.C.P. 106(b) and thirty-five days under section 24–4–106(4) to bring an action for judicial review. According to Aurora and the CEDC, because the Hotels' initial complaint was not filed until September 2013, it was untimely, and the trial court lacked subject matter jurisdiction to hear the case. In contrast, the Hotels and the CEDC contend that final agency action occurred in August 2013, when the Attorney General denied the Hotels' petition on behalf of CEDC. We disagree with both parties as to the date of final agency action, but nevertheless conclude that the Hotels' complaint was timely filed.

## A. Standard of Review and Applicable Law

¶ 18 C.R.C.P. 106(b) requires a party seeking judicial review pursuant to C.R.C.P. 106(a)(4) to file a complaint in the district court no later than twenty-eight days after the "final decision" of the tribunal being challenged. Section 24–4–106(4) similarly provides for judicial review of final agency action; however, petitions filed under that statute must be filed within thirty-five days of the effective date of agency action. Both periods are jurisdictional, and may be raised at any time. *Medina v. State*, 35 P.3d 443, 452 (Colo. 2001).

¶ 19 This "point of administrative finality," occurs on the date when "the action complained of is complete," leaving "nothing further for the agency to decide." *3 Bar J Homeowners Ass'n, Inc. v. McMurry*, 967 P.2d 633, 634 (Colo.App.1998) (internal quotation marks omitted). "In both judicial and quasi-judicial contexts, we have characterized a final judgment or decision generally as one that ends the particular action in which it is entered, leaving nothing further to be done to completely determine the rights of the parties." *Citizens for Responsible Growth v. RCI Dev. Partners, Inc.*, 252 P.3d 1104, 1106–07 (Colo. 2011). Finality "depends upon the scope and nature of the proceeding and rights at issue," and we have long accepted that the "finality in any particular context is subject to the dictates of statute, court rule, or regulation." *Id.* at 1107.

## B. Analysis

### 1. Final Agency Action

█ ¶ 20 The issue here is when the "point of administrative finality" occurred for the purposes of judicial review under C.R.C.P. 106(a)(4) and section 24–4–106(4). As noted, Aurora contends that the final action occurred on May 18, 2012, when the CEDC conditionally approved the Gaylord Project, while the Hotels contend that the final agency action occurred on August 15, 2013, when the Attorney General denied their petition for reconsideration.

¶ 21 We disagree with both positions. Rather, we conclude that final agency action did not occur until October 2013 when the CEDC adopted a resolution memorializing the terms of the award, pursuant to section 24–46–305(3).

¶ 22 Although no published Colorado appellate cases have yet addressed administrative finality under the RTA, analogous cases support our conclusion that the CEDC's preliminary and conditional approval of Aurora's RTA award did not constitute final agency action. *See Wilson v. Bd. of Cnty. Comm'rs,* 992 P.2d 668, 670 (Colo.App.1999) (holding that evidence of a later written resolution by the board of county commissioners demonstrates that an earlier vote denying plaintiff's requested permit was not final agency action); *Luck v. Bd. of Cnty. Comm'rs,* 789 P.2d 475, 477 (Colo.App.1990) (holding that conditional approval of a rezoning application by a board of county commissioners did not constitute final agency action).

¶ 23 Here, the May 2012 conditional approval did not constitute final agency action. We reach this conclusion for three reasons.

¶ 24 First, section 24–46–305(3) requires the CEDC to pass a resolution memorializing the terms of any award issued under that statute. Although the CEDC voted to approve the project with conditions in May 2012, it did not issue the required resolution detailing the terms of the award until October 2013. As a result, its approval of Aurora's application in May 2012 did not constitute final agency action.

¶ 25 Second, the CEDC's May 2012 preliminary approval contained conditions which Aurora had 120 days to fulfill. Such an approval, by its very nature, contemplates further agency action to determine whether the conditions have been satisfied. As of May 2012, it was still unresolved whether Aurora would satisfy the CEDC's conditions. *See Luck,* 789 P.2d at 477 (conditions on a preliminary approval of a rezoning plan precluded administrative finality).

¶ 26 Third, our conclusion comports with principles of judicial economy. Accepting Aurora's argument that the CEDC's May 2012 conditional approval constituted final agency action would require parties affected by a conditional approval of an award under the RTA to commence litigation before knowing whether the recipient of the RTA award would fulfill those conditions and receive final approval. Such a rule would result in needless litigation if the RTA applicant did not satisfy the conditions attendant to CEDC approval.

¶ 27 Our holding is consistent with the majority's decision in *3 Bar J,* 967 P.2d at 634. There, Chaffee County's Board of County Commissioners publicly voted to conditionally approve a subdivision plat. *Id.* Upon fulfillment of the conditions, the final subdivision plats were privately signed and recorded by the developers and the county commissioners. *Id.* The majority concluded that the Board's decision became final upon the public vote and approval—and not the private signing and recording—even though the preliminary decision had placed conditions on the approval. *Id.*

¶ 28 The majority reasoned that finality must be easily discernable and expressed concern in adopting a position that finality could occur privately. *Id.* at 635 ("Plaintiff's construction of the rule would lead to uncertainty because it would place objectors in the precarious position of not knowing exactly when finality had occurred for purposes of judicial review."). The *3 Bar J* division's concern that finality could occur privately is not present here because the RTA requires the CEDC to adopt a final resolution which includes the area of the regional tourism zone and the total cumulative dollar amount

and percentage of state sales tax revenue dedicated to the project. § 24-46-305(3)(a)-(d).

¶ 29 We find the division's conclusion in *Wilson* instructive. 992 P.2d at 670. There, Weld County's Board of County Commissioners adopted a resolution denying the plaintiff's requested accessory dwelling permit. *Id.* at 669. However, unlike in *3 Bar J*, the Board subsequently issued a written resolution detailing its findings and conclusion. *Id.* The division concluded that "[t]he Board's actions in entering [the] written resolution and later revising it demonstrate that at the time of the Board's [initial approval] its action was not complete, 'leaving nothing further' for it to decide." *Id.* at 670. Likewise, the CEDC's conduct in initially approving Aurora's application in May 2012 and later entering a final written resolution demonstrates that administrative proceedings were incomplete at the time of the initial approval.

¶ 30 Finally, we reject the Hotels' contention that the August 2013 letter from the Attorney General denying their petition constituted final agency action. The Hotels characterized their petition as a "request for reconsideration of the preliminary grant to the City of Aurora." Implicit in that request was the belief that the "preliminary grant" was not final and could be reconsidered as part of an ongoing agency decision.

¶ 31 For the forgoing reasons, we conclude that the CEDC's decision to issue Aurora's RTA award was not final until it adopted the October 2013 resolution.

### 2. Premature Filing of Complaint

¶ 32 Having concluded that administrative finality occurred in October 2013, we must address whether the Hotels' premature filing of their complaint in September 2013 renders the complaint untimely. We conclude that it does not.

¶ 33 Colorado appellate courts have consistently concluded that a premature petition for judicial review in a district court—like a premature filing of a notice of appeal to this court—does not warrant the dismissal of the action. *See Denver Local 2-477, Oil, Chem. & Atomic Workers' Int'l, Union v. Metro Wastewater Reclamation Dist.*, 7 P.3d 1042, 1045 (Colo.App.1999) ("[E]ven if we assume that the Union's petition was prematurely filed, absent a showing of prejudice to the other party, we conclude that dismissal of the petition was error."); *Save Park Cnty. v. Bd. of Cnty. Comm'rs*, 969 P.2d 711, 713 (Colo. App.1998) ("[A]bsent a showing of prejudice, the premature filing of an appeal does not preclude the court from addressing the case on its merits."); *Kidwell v. K-Mart Corp.*, 942 P.2d 1280, 1282 (Colo.App.1996) ("Accordingly, plaintiff's notice of appeal ... was premature. However, because K-Mart was not prejudiced by the early filing, we address the merits of the appeal."); *see also Musick v. Woznicki*, 136 P.3d 244, 246 (Colo. 2006) ("[A] trial court is not divested of jurisdiction when a party files a premature notice of appeal of a nonfinal judgment.").

¶ 34 These decisions support our conclusion that the trial court obtained jurisdiction in October 2013 when the CEDC issued a final resolution approving the RIDA/Marriott Project.[5] *See Denver Local 2-477*, 7 P.3d at 1045 ("[W]e conclude that the district court acquired jurisdiction to rule upon the Union's petition for judicial review once [the agency decision] became final."). Therefore, the Hotels' premature filing of a complaint with the district court did not deprive the court of jurisdiction or preclude the court from addressing the case on the merits once the CEDC's action became final. Accordingly, we reject the CEDC's and Aurora's contention that the Hotels' complaint was untimely.

### III. Standing

¶ 35 Having concluded that the Hotels timely filed their complaint in the district court, we next address their contention that the trial court erred when it concluded that they lacked standing to bring their first, second, and fourth claims for relief. Specifically, the Hotels contend that the trial court misapplied the competitor standing doctrine

---

**5.** Although the Hotels filed their second amended complaint after CEDC had issued its resolution approving the RIDA/Marriott International proposal, that pleading did not mention the CEDC's resolution.

articulated by the supreme court in *Cloverleaf Kennel Club, Inc. v. Colorado Racing Commission*, 620 P.2d 1051 (Colo. 1980), and other similar cases. They allege direct economic harm as a result of the CEDC's approval of the RIDA/Marriott Project, a direct competitor, and assert that such economic harm is sufficient to establish standing. However, because such harm only indirectly results from the CEDC's and Aurora's alleged failure to comply with the RTA, we disagree.

### A. Standard of Review and Applicable Law

¶ 36 Standing, like timeliness, is a threshold jurisdictional question that we review de novo. *Taxpayers for Pub. Educ. v. Douglas Cnty. Sch. Dist.*, 2015 CO 50, ¶ 13, 351 P.3d 461, 467; *Hickenlooper v. Freedom from Religion Found., Inc.*, 2014 CO 77, ¶ 7, 338 P.3d 1002, 1006; *Barber v. Ritter*, 196 P.3d 238, 245 (Colo. 2008). Standing must be determined before a decision on the merits and, where a court concludes that standing does not exist, it must dismiss the case. *Hickenlooper*, ¶ 7, 338 P.3d at 1006.

¶ 37 To establish standing under Colorado law, plaintiffs must satisfy a two-part test: (1) the plaintiffs must allege an "injury in fact" and (2) the injury must be to a legally protected interest. *Barber*, 196 P.3d at 245–46; *Wimberly v. Ettenberg*, 194 Colo. 163, 168, 570 P.2d 535, 538 (1977). "In determining whether a plaintiff has asserted a sufficient injury to satisfy the test of standing, the court must accept the averments of the complaint as true and may consider other evidence supportive of standing." *Colo. Gen. Assembly v. Lamm*, 700 P.2d 508, 516 (Colo. 1985). "Although necessary, the test in Colorado has traditionally been relatively easy to satisfy." *Ainscough v. Owens*, 90 P.3d 851, 856 (Colo. 2004).

¶ 38 Several principles guide our application of the "injury in fact" requirement. First, the supreme court has explained that "[t]o constitute an injury-in-fact, the alleged injury may be tangible, such as physical damage or economic harm, or intangible, such as aesthetic harm or the deprivation of civil liberties." *Barber*, 196 P.3d at 245–46; *Ainscough*, 90 P.3d at 856.

¶ 39 Second, the injury cannot be "the remote possibility of a future injury" nor an injury that is overly speculative. *Hickenlooper*, ¶ 9, 338 P.3d at 1007; *Cloverleaf*, 620 P.2d at 1057.

¶ 40 Third, the alleged injury cannot be "indirect and incidental to the defendant's action." *Barber*, 196 P.3d at 246 (internal quotation marks omitted). In several cases, the supreme court has distinguished between conduct that directly causes a plaintiff's alleged injury and conduct that merely encourages or promotes a third party to engage in such conduct. *See Brotman v. E. Lake Creek Ranch, L.L.P.*, 31 P.3d 886, 890–91 (Colo. 2001); *Cloverleaf*, 620 P.2d at 1057; *Wimberly*, 194 Colo. at 165, 570 P.2d at 537. Because these cases are relevant to our conclusion, we discuss them in greater detail below.

¶ 41 Finally, we note that the "injury in fact" prong derives from the separation of powers doctrine found in article III of the Colorado Constitution,[6] as well as article IV, section 1's requirement that Colorado courts limit their inquiries to the resolution of actual controversies. As the supreme court explained in *Hickenlooper*, ¶ 9, 338 P.3d at 1006 (quoting *Wimberly*, 194 Colo. at 167, 570 P.2d at 538),

> [T]he injury-in-fact requirement, maintains the separation of powers mandated by article III of the Colorado Constitution by preventing courts from invading legislative and executive spheres. Because judicial determination of an issue may result in disapproval of legislative or executive acts, this constitutional basis for standing ensures that judicial "determination may not

---

**6.** Article III reads:

The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial; and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any power properly belonging to either of the others, except as in this constitution expressly directed or permitted.

be had at the suit of any and all members of the public."

¶ 42 *See also Ainscough,* 90 P.3d at 855; *Conrad v. City & Cty. of Denver,* 656 P.2d 662, 668 (Colo. 1982).

■■■ ¶ 43 Our standing test's second prong requires that plaintiffs have a legally protected interest. *Ainscough,* 90 P.3d at 856. This inquiry focuses on "whether the plaintiff has a claim for relief under the constitution, the common law, a statute, or a rule or regulation." *Id.* Like an "injury in fact," a legally protected interest can be tangible such as "one of property, one arising out of a contract, one protected against tortious invasions, or one founded on a statute which confers a privilege," or intangible, such as "an interest in free speech or expression, or an interest in having a government that acts within the boundaries of our state constitution." *Id.* (internal quotation marks omitted).

## B. Analysis

■■ ¶ 44 We conclude that the Hotels' alleged injury is "indirect and incidental" to Aurora's alleged wrongdoing and, therefore, they lack standing to bring their first, second, and fourth claims for relief. The supreme court has consistently held that plaintiffs lack standing where alleged economic harm is indirectly or incidentally caused by a defendant's alleged conduct. The court has distinguished between conduct that directly causes the plaintiff's alleged injury, and conduct that encourages or promotes a third party to engage in conduct that causes a plaintiff's injury. *See Brotman,* 31 P.3d at 890–91; *Cloverleaf,* 620 P.2d at 1057; *Wimberly,* 194 Colo. at 165, 570 P.2d at 537.

¶ 45 In *Wimberly,* the supreme court addressed whether a group of bail bondsmen had standing to challenge a district court judge's pretrial release program, which they alleged caused them severe economic harm. 194 Colo. at 165, 570 P.2d at 537. The program made it easier for criminal defendants to post bond by requiring a deposit of only ten percent of the total amount of their bail, significantly less than what was previously required. *Id.* Several bail bondsmen sued to enjoin the new program, claiming that it would bankrupt them. *Id.* However, the supreme court concluded that the bondsmen had not alleged an injury in fact because, "[a]lthough the pre-trial release program may affect the business of the bail bondsmen as a practical matter, it does so only indirectly by permitting criminal defendants to choose amongst an increased number of bail alternatives." *Id.* at 168, 570 P.2d at 539. Such an injury, the court concluded, was "indirect and incidental" to the enactment of the pretrial release program.

¶ 46 The court reached a similar conclusion in *Cloverleaf,* 620 P.2d at 1053. There, a racetrack operator challenged a decision by the Colorado Racing Commission, the state agency charged with regulating dog racing, to grant a competitor racetrack additional racing days. *Id.* at 1052. The law at the time permitted dog racetracks to operate only thirty-five days per year but provided a mechanism through which they could request additional days. *Id.* The court determined that the plaintiff racetrack did not have standing to challenge the Commission's decision, concluding that "direct, palpable economic injury cannot logically be inferred from the simple, undisputed allegation that [a competitor] was allotted more racing days than were the petitioners." *Id.* at 1057. The court concluded that the plaintiff racetrack's harm was not caused by the Commission's allegedly unlawful grant of extra racing days, but rather, by the competitor racetrack's subsequent lawful marketplace competition. *Id.*

¶ 47 The supreme court applied similar reasoning more recently in *Brotman,* 31 P.3d at 890–91. Plaintiff, a ranch owner, sued to enjoin a land transaction between his neighbor and the State Board of Land Commissions. Although the ranch owner did not allege that he would suffer harm directly from the proposed transaction, he claimed that, upon completion of the transaction, the neighbor would immediately seek—or at the very least be better positioned to seek—an easement across his ranch. Such an injury

was too indirect, the supreme court concluded, because the alleged harm to the ranch "would not be a result of the allegedly unlawful agreement, but rather would be the result of a landowner exercising his valid, constitutional rights under the [Colorado Constitution]." *Id.* at 891.

¶ 48 In *Wimberly, Cloverleaf,* and *Brotman,* the supreme court distinguished between allegedly wrongful conduct that directly affects a plaintiff's legally protected rights—including economic well-being—and wrongful conduct that merely encourages or permits a third party to engage in conduct that affects a plaintiff's legally protected interest. These cases establish that injuries resulting only from the grant of an economic benefit to a competitor or an adjunct property owner are "indirect" and therefore insufficient to establish standing.

¶ 49 Here, even if we assume that the RIDA/Marriott International Project will cause the Hotels economic harm by drawing away some of their existing customers,[7] such harm is not directly caused by the CEDC or Aurora's conduct in allegedly failing to comply with the RTA. Rather, it would result from RIDA's subsequent lawful conduct of competing in the tourism marketplace. Although the CEDC's approval of Aurora's application may affect the Hotels' business as a practical matter, it does so only by indirectly permitting consumers to choose among an increased number of alternatives. Because the Hotels' alleged harm results only from RIDA's potential to lawfully compete against the Hotels, they lack standing to challenge the CEDC's alleged failure to comply with the RTA.

¶ 50 Our conclusion is consistent with the supreme court's recent decision in *Colorado Medical Society v. Hickenlooper,* 2015 CO

41, ¶ 1, 349 P.3d 1133, 1134, on which the Hotels rely. There, the supreme court considered whether the Colorado Medical Society and the Colorado Society of Anesthesiologists had standing to challenge the governor's decision that Colorado opt out of a federal regulation that required nurses administering anesthesia to do so under a physician's supervision. *Id.* at ¶¶ 12–13, 349 P.3d at 1136–37. The supreme court concluded that the medical societies' allegations that the change would negatively impact their reputation, how they practice medicine, and reduce their income satisfied the "injury-in-fact" requirement. *Id.* at ¶ 14, 349 P.3d at 1137.

¶ 51 The supreme court held that the medical societies sufficiently alleged their members would suffer direct harm because the governor's decision would restructure the regulatory framework under which they operated. No such regulatory change occurred here. The CEDC's RTA award did not modify the regulatory framework under which the Hotels compete. We recognize that, by subsidizing a direct economic competitor, the CEDC may cause the Hotels economic harm; however, such alleged harm would result from the relative economic strength of their competitor—here, the RIDA/Marriott Development—and thus would be indirect.

¶ 52 Our conclusion also comports with the separation of powers principles derived from article III of the Colorado Constitution and embodied in our standing jurisprudence. *See Hickenlooper,* ¶ 9, 338 P.2d at 1006. The General Assembly enacted the RTA to promote the development of large-scale regional tourism projects. § 24–46–302(1)(d). Such projects invariably cross a multitude of economic sectors and affect a plethora of actors. Yet, under the Hotels' interpretation of

---

7. Our assumption here in no way suggests that the RTA will unfairly prejudice those parties competing in the same marketplace as award recipients. In fact, the RTA—the aim of which is to attract commerce that otherwise would not come to Colorado—was designed to avoid such a result. *See* § 24–46–302(1)(c), C.R.S.2014 ("Colorado is in competition with other states to attract large-scale regional tourism projects.").

RTA applicants must establish that a sizeable portion of the revenue generated by the proposed project will be attributable to transactions with non-Coloradans or, in the alternative, that the same revenue is attributable to Coloradans but would otherwise leave the state due to a lack of a similar attraction within Colorado. § 24–46–304(3)(c).

standing law, any party who alleges an adverse economic impact from the development of an RTA project would have standing to challenge the CEDC's award. Accordingly, the Hotels' position could allow continual challenges to the RTA's decisions, contrary to the rationale that "judicial determination may not be had at the suit of any and all members of the public." *Hickenlooper*, ¶ 9, 338 P.3d at 1006 (internal quotation marks omitted).

¶ 53 Finally, we reject the Hotels' position that our conclusion precludes judicial review of CEDC awards under the RTA in all cases. At the very least we presume that those parties vying for the same RTA award would have standing to challenge the procedures followed by the CEDC and others during that process. In any event, we decline to speculate as to what other parties may have standing to challenge RTA awards.

¶ 54 Having concluded that the Hotels' lawsuit does not allege an injury in fact, directly attributable to the CEDC and Aurora's alleged misconduct, we need not consider whether the alleged injury is to a legally protected interest. *See Cloverleaf*, 620 P.2d at 1057 (The plaintiff's "failure to sufficiently allege competitive economic injury" attributable to defendant's wrongdoing, "obviates the necessity" to address whether the alleged harm is to a legally protected interest.).

¶ 55 Therefore, we conclude that the trial court did not err when it dismissed the Hotels' first, second, and fourth claims for lack of standing.

## IV. Third Claim: Constitutionality of Section 24–46–309

¶ 56 Finally, having concluded that the CEDC's October 2013 resolution constituted final agency action, we do not address the Hotels' contention that the trial court misconstrued its third claim for relief as a facial challenge to section 24–46–309. That claim, as alleged in the second amended complaint, was contingent on the trial court finding that the May 2012 approval of the Gaylord Project constituted final agency action. Because we have concluded that the October 2013 resolution constituted the final agency action here—and because the Hotels do not argue that subsection 309, as applied after that point, constituted an irrevocable grant in violation of article II, section 11 of the Colorado Constitution—we do not address this contention.

## V. Conclusion

¶ 57 The order is affirmed.

JUDGE HAWTHORNE and JUDGE BERGER concur.